[677 NYS2d 292]

MARK G. et al., Appellants-Respondents, v BARBARA J. SABOL, Individually and as Administrator of the New York City Human Resources Administration and as Social Services Commissioner of the City of New York, et al., Respondents-Appellants.

MARTIN A. et al., Appellants-Respondents, v BARBARA J. SABOL, Individually and as Administrator of the New York City Human Resources Administration and as Social Services Commissioner of the City of New York, et al., Respondents-Appellants.

DAKINYA B. et al., Appellants-Respondents, v BARBARA J. SABOL, Individually and as Administrator of the New York City Human Resources Administration and as Social Services Commissioner of the City of New York, et al., Respondents-Appellants.

FRANCES F. et al., Appellants-Respondents, v BARBARA J. SABOL, Individually and as Administrator of the New York City Human Resources Administration and as Social Services Commissioner of the City of New York, et al., Respondents-Appellants.

First Department, June 23, 1998

### APPEARANCES OF COUNSEL

*Mark G. Peters* of counsel (*Martha Stone, Marcia Robinson Lowry, David Rivkin, Robert Goodman* and *Robert H. Hotz, Jr.,* on the brief, *Children's Rights, Inc.,* and *Debevoise & Plimpton,* attorneys), for appellants-respondents.

*Fay Ng* of counsel (*Pamela Seider Dolgow* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for respondents-appellants.

### OPINION OF THE COURT

ANDRIAS, J.

The principal issue presented is the effect of Federal funding statutes on State social services programs and whether the acceptance by the States of such funding creates an individual right enforceable pursuant to the Civil Rights Act of 1881 as

codified in 42 USC § 1983 for parties aggrieved by failures in such State programs. The answer varies from statute to statute and must be determined by the specific provisions of each statute. All of these statutes are intended to benefit the recipients of the State social services. The determinative question, however, is whether an aggrieved plaintiff is intended to be a direct or indirect beneficiary of such funding.

These cross appeals arise from four actions brought on behalf of the children in four families who, to varying degrees, are alleged to have been victimized by our foster care system and seek relief against defendants under various theories, including violations of Federal and State child welfare statutes and their rights under the United States and New York Constitutions.

The original action was commenced by the A. and B. families in October 1985. The F. and G. families served intervening complaints in April 1991 and March 1992, respectively. The Bronx Public Administrator also served an intervening complaint in March 1992 on behalf of the estate of Alan G., who was beaten to death by his father on March 5, 1990.

On a previous appeal, in *Martin A. v Gross* (153 AD2d 812), we affirmed the grant of a preliminary injunction (138 Misc 2d 212 [Elliott Wilk, J.]) to ensure compliance by the City defendants with the nondiscretionary requirements of Social Services Law § 409-a (1) (a) and § 409-e that a plan for the provision of preventive services to avoid unnecessary foster care placement of the affected children be developed within certain mandatory timetables.

Since our decision in *Martin A. v Gross (supra)*, plaintiffs have withdrawn their request for class certification and all claims for injunctive and declaratory relief. They now seek only monetary damages for the individual plaintiffs.

In four of these cross appeals, which have been consolidated, plaintiffs appeal the dismissal of virtually all their claims on defendants' motion for partial summary judgment, while defendants cross-appeal, seeking dismissal of plaintiffs' remaining claims pursuant to Social Services Law § 409 *et* seq. and Article XVII of the New York State Constitution.

The other cross appeals, ordered to be heard with the foregoing consolidated cross appeals, arise from the personal injury and wrongful death claims brought by the Public Administrator on behalf of the estate of Alan G. There, defendants appeal the partial denial of their motion to dismiss such claims on Statute of Limitations grounds, while the Public Administrator

cross-appeals to the extent that the claims for wrongful death were dismissed.

Primarily, plaintiffs contend that they are entitled to pursue a private right of action pursuant to the Federal child welfare statutes in issue, the Adoption Assistance and Child Welfare Act of 1980 (AACWA; 42 USC §§ 620-628, 670-679a) and the Child Abuse Prevention and Treatment Act (CAPTA; 42 USC § 5101 *et seq.),* essentially relying upon the interlocutory District Court decisions in *Marisol A. v Giuliani* (929 F Supp 662) and *Jeanine B. v Thompson* (877 F Supp 1268 *[Jeanine B. I]*) and arguing that the authorities relied upon by the City in opposing such claims are the progeny of the legislatively overruled *Suter v Artist M.* (503 US 347).

When these cross appeals were originally argued, *Suter v Artist M. (supra),* decided in 1992, was the latest in a line of Supreme Court cases, including *Pennhurst State School v Halderman* (451 US 1), *Wright v Roanoke Redevelopment & Hous. Auth.* (479 US 418), *Golden State Tr. Corp. v Los Angeles* (493 US 103) and *Wilder v Virginia Hosp. Assn.* (496 US 498), which developed a three-pronged test to be applied in determining whether a particular Federal statute creates a "federal right" enforceable pursuant to section 1983.[1]

*Suter* dealt with a class of children who alleged that the officials in charge of the Illinois foster care system were not making the "reasonable efforts" mandated by section 671 (a) (15) of AACWA (42 USC § 671 [a] [15]), which requires participating States to submit a plan which "provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." The Court, distinguishing the statute and regulations before it from those in *Wilder,* essentially held that AACWA only requires a State to submit a plan for approval by the Federal agency, but provides no guidance for determining what are "reasonable efforts". Thus, the Court held, section 671 (a) (15) does not confer an enforceable right on behalf of its beneficiaries and does not cre-

---

1. "Such an inquiry turns on whether 'the provision in question was intend[ed] to benefit the putative plaintiff.' * * * If so, the provision creates an enforceable right unless it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit * * * or unless the interest the plaintiff asserts is 'too vague and amorphous' such that it is ' "beyond the competence of the judiciary to enforce" ' " (496 US, *supra,* at 509 [citations omitted]).

ate an implied cause of action on their behalf (*supra*, at 363-364).

Because *Suter* did not explain the impact of its analysis on the *Wilder* test and the dissent characterized it as a departure from *Wilder*, it appeared to some observers to depart from *Wilder* in some respects and subsequent courts expressed differing opinions in attempting to reconcile or differentiate *Wilder* and *Suter*. In 1994, Congress went so far as to amend the Social Security Act of which AACWA is a part,[2] suggesting to some that it limited the analysis in *Suter* to the specific section of AACWA in issue there and that, for any determination of "Federal rights" under any other provisions of AACWA, the courts had to look to pre-*Suter* precedents for guidance (*see, Jeanine B. v Thompson, supra*, at 1283).

However, any doubt about the continuing validity of *Suter* was removed by the Supreme Court's subsequent decision in *Blessing v Freestone* (520 US 329, 117 S Ct 1353 [Apr. 21, 1997]), where five Arizona mothers, whose children are eligible for State child support services under title IV-D of the Social Security Act, brought suit pursuant to section 1983 against the director of the State child support agency alleging numerous deficiencies in Arizona's child support enforcement program and seeking declaratory and injunctive relief requiring substantial compliance with the requirements of title IV-D. In reversing the Ninth Circuit's holding (68 F3d 1141) that the five mothers had an enforceable individual right to have the State achieve "substantial compliance" with title IV-D, the Court (per O'Connor, J.) implicitly reaffirmed the rationale of *Suter* and unanimously held that "the requirement that a State operate its child support program in 'substantial compliance' with Title IV-D was not intended to benefit individual children and custodial parents, and therefore it does not constitute a Federal right. * * * In short, the substantial compliance standard is designed simply to trigger penalty provisions that

---

2. "42 USC § 1320a-2. Effect of failure to carry out State plan

"In an action brought to enforce a provision of this chapter, such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., [503 US 347,] 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671 (a) (15) of this title is not enforceable in a private right of action."

increase the frequency of audits and reduce the State's AFDC grant by a maximum of five percent. As such, it does not give rise to individual rights." (*Supra*, 520 US, at 344.)

We also find persuasive the post-*Suter*, postamendment, pre-*Blessing* decisions of two Federal appeals courts which had occasion to revisit the issue of private rights of action under Federal child welfare statutes and the criteria to be applied in determining whether a particular Federal statute creates an individual right enforceable pursuant to section 1983.

In the first, the Circuit Court of Appeals for the District of Columbia (D.C.) Circuit, using an analysis similar to *Blessing*, has held in a post-*Suter*, postamendment, pre-*Blessing* decision that an infant plaintiff, who sued the District of Columbia government and two of its employees for damages for injuries she allegedly received in foster care as a result of the defendants' failure to investigate and protect her from abuse and neglect, cannot enforce a provision of CAPTA under section 1983. (*Doe v District of Columbia*, 93 F3d 861). In affirming the dismissal of the identical Federal statutory claim under 42 USC § 5106a (b) (2) made by plaintiffs here, the Court of Appeals found that the District Court correctly applied the Supreme Court's reasoning in *Suter*.

Recognizing that although *Suter* and *Wilder* both involved statutory schemes and language of similar character and that the Supreme Court in *Wilder* found an enforceable right, whereas in *Suter* it did not, the D.C. Circuit followed *Suter*'s lead in distinguishing the language at issue in each case. In *Suter* (*supra*, at 359), the Supreme Court was careful to point out that the Medicaid legislation at issue in *Wilder* "set forth in some detail the factors to be considered" in setting rates. The court distinguished AACWA, noting that it provided no guidance on how to measure reasonable efforts despite regulations promulgated under the Act that provided "a laundry list of services that *may* be included in a state's proposal" (93 F3d, *supra*, at 867). CAPTA, the D.C. Circuit found, analogously fails to offer a definition of what constitutes a "prompt investigation" and, unlike the regulations in *Wilder*, its regulations do not mandate factors that must be part of an "investigation". "The striking parallels to the Adoption Act [AACWA] and its related regulations place this case squarely under the rationale of *Suter* and therefore *Wilder* is distinguishable". (*Supra*, at 867.)

While *Blessing* dealt with a different statute, its significance lies in its refinement of the three-pronged test set forth in *Wil-*

*der v Virginia Hosp. Assn. (supra)*[3] and its distinction between provisions of title IV-D intended to benefit individual recipients and provisions intended "only to guide the State in structuring its systemwide efforts at enforcing support obligations", which provisions may ultimately benefit individuals eligible for title IV-D services, but only indirectly (*Blessing v Freestone, supra,* 520 US, at 344).

For instance, the Court, in *Blessing*, found that the detailed requirements set forth in title IV-D for Arizona's data processing system and the staffing levels of the State agency administering the program do not give rise to individualized rights to computer services, but are simply intended to improve the over-all efficiency of Arizona's child support enforcement scheme. Likewise, it found that the mandates of the statute and the relevant regulations, that Arizona establish a separate child support enforcement unit with "sufficient staff" to fulfill specified functions, do not give rise to individual Federal rights inasmuch as the link between staffing and the services provided to any particular individual is far too tenuous to support the conclusion that Congress intended to give each and every Arizonan eligible for title IV-D benefits the right to have the relevant State agency staffed at a "sufficient" level. Moreover, it found that neither the statute nor the regulation gives any guidance as to how large a staff would be "sufficient" and, thus, enforcement of such an undefined standard would " 'strain judicial competence' " (*supra*, at 1362 [citations omitted]).

Here, plaintiffs specifically rely upon certain provisions of CAPTA, 42 USC § 5106a (b) (1) (A); (2) and (3), which require a reporting system for allegations of child abuse or neglect; a system for prompt investigation of such allegations and for immediate action to protect children who are abused or neglected children or are in danger of abuse or neglect; and, procedures, personnel, facilities, programs, training and services to

---

**3.** "We have traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. *Wright*, 479 U.S., at 430. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. *Id.*, at 431-432. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory rather than precatory terms. *Wilder, supra,* at 510-511; see also *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17" (*Blessing v Freestone, supra,* 520 US, at 340-341).

adequately address cases of child abuse and neglect. They also rely upon a specific provision of AACWA, viz., 42 USC § 671 (a) (16), which requires that, in order to be eligible for payments under the statute, a State shall have a plan approved by the Secretary of Health and Human Services, which "provides for the development of a case plan (as defined in section 675 (1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675 (5) (B) of this title with respect to each such child".

Plaintiffs' CAPTA claims pursuant to 42 USC § 5106a (b) (1) (A) and (3) were properly dismissed by the IAS Court because New York State has in place the required reporting provisions and because, under the third criterion of the *Wilder* test, the adequacy of the administration and operation of such laws is an area too vague and amorphous for judicial enforcement. Plaintiffs also assert a claim pursuant to section 5106a (b) (2)[4] in which they allege, *inter alia,* that defendants failed to promptly commence investigations upon receipt of reports of child abuse or neglect or that upon a finding of abuse or neglect, immediate protective steps were not taken relative to the subject child or other children under the same care.

In dismissing this claim, the IAS Court properly relied upon *"Tony" L. v Childers* (71 F3d 1182, *cert denied sub nom. Simpson v Childers,* 517 US 1212), another post-*Suter*, post-amendment, pre-*Blessing* appellate decision and its analysis. In *"Tony" L.*, the Sixth Circuit, applying the same analysis later used by the Supreme Court in *Blessing* (*supra*), and the District of Columbia Circuit in *Doe* (*supra*), implicitly recognized the continued viability of *Suter* and correctly characterized the issue presented to us, i.e., "whether CAPTA creates a particularized duty on the State, as in *Wilder*, or whether it merely creates a generalized duty on the State, as in *Suter*" (71 F3d, *supra,* at 1189; *see also, Doe v District of Columbia*, 93 F3d 861, 864, *supra).*

---

**4.** "(b) Eligibility requirements

"In order for a State to qualify for a grant under subsection (a) of this section, such State shall * * *

"(2) *provide that* upon receipt of a report of known or suspected instances of child abuse or neglect an investigation shall be initiated promptly to substantiate the accuracy of the report, and, upon a finding of abuse or neglect, immediate steps shall be taken to protect the health and welfare of the abused or neglected child and of any other child under the same care who may be in danger of abuse or neglect" (emphasis added).

The Circuit Court found that the implementing regulations for CAPTA placed the case in between the Supreme Court's teachings in *Wilder* and *Suter*, inasmuch as while they use the word "may" and the State need not rely on the examples of "investigation" and "emergency services" provided, they clearly are intended to provide some guidance to the States, unlike *Suter*, in which no guidance whatsoever was provided. Nevertheless, the court found that "[t]he statute and regulations at issue are more like those in *Suter* (no guidelines) than those in *Wilder* (mandatory guidelines)" (*supra*,at 1189). It is apparent and reasonable, the court found, that Congress wanted to give States a certain amount of discretion in exercising their duties under CAPTA (*supra*).

Thus, inasmuch as we are dealing here with the identical child welfare statutes analyzed in *Suter (supra) Doe (supra)* and *"Tony" L. (supra)*, dismissal of plaintiffs' claims based upon these statutes was clearly warranted.

As noted above, the Federal courts originally lacked a common view on the effect of the Supreme Court's decision in *Suter* on section 5106a (b) (2) because of Congress's 1994 amendment. However, while that may have been the case when this appeal was originally argued, since then all of the Federal courts dealing with the issue have applied the analysis used by the Supreme Court in *Blessing* and held that section 5106a (b) (2) merely mandates that the State "provide that" there be a prompt investigation of child abuse reports. Indeed, the decision in *Jeanine B. I*, relied upon by plaintiffs here, itself has been reconsidered in light of *Blessing* and those plaintiffs' CAPTA claims have been dismissed. The *Jeanine B. II* court also stated that, although reconsideration of plaintiffs' AACWA claims was not requested, its preliminary belief is that *Blessing* also impacts the continued validity of the court's prior holding that AACWA creates Federal rights enforceable under section 1983 and asked the parties to brief that issue (*Jeanine B. v Thompson*, 967 F Supp 1104, 1118 *[Jeanine B. II]*).

Likewise, in *Marisol A. (supra)*, the other case relied upon by plaintiffs here, where only injunctive relief was sought, the court stated that it was persuaded that the plaintiffs there were entitled to claim alleged violations of CAPTA pursuant to section 1983 in light of the 1994 amendment disapproving of the Supreme Court's reasoning in *Suter* as well as the original decision in *Jeanine B. I*. However, now that the CAPTA claims in *Jeanine B. I* have been dismissed, it would appear that the case law underpinning plaintiffs' reasoning here has been

severely undercut if not judicially extinguished. As stated in *Jeanine B. II* (*supra*, at 1116), the current trend in Federal appellate court decisions is contrary to the court's original decision in *Jeanine B. I*. This trend is further confirmed by the very recent reversal by the Eleventh Circuit of *Harris v James* (883 F Supp 1511, 1520), another decision relied upon by the *Marisol A.* court. Thus, while the decision in *Marisol A.* remains undisturbed at this time, its reasoning has been severely eroded.

The Eleventh Circuit, in reversing *Harris v James* (*supra*), thought it safe, based upon its review of the Supreme Court's case law (including *Blessing*) governing whether and under what circumstances violations of Federal statutes create a cause of action under section 1983, to declare that the holdings in *Wright (supra)* and *Wilder (supra)* and the three-pronged "enforceable rights" test developed in *Wright* and *Wilder* remain good law; and that, except to the extent it possibly intended to announce a rule that a provision is unenforceable under section 1983 simply because of its inclusion in a Federal funding statute requiring a State plan or specifying the contents of such a plan, the Supreme Court's decision in *Suter* remains good law (*Harris v James*, 127 F3d 993, 1004).

It is thus clear to us that under any analysis, whether pre-*Suter*, *Suter*, or postamendment, post-*Blessing*, plaintiffs' claims pursuant to the respective sections of CAPTA and AACWA were properly dismissed.

While AACWA simply requires that, in return for their acceptance of the Federal funds provided, the participating States must have a plan approved by the Secretary which meets standards set forth in 17 paragraphs, plaintiffs nevertheless contend that paragraph (16) as opposed to paragraph (15) is subject to private enforcement (42 USC § 671 [a]).

Since we are agreed that *Wilder (supra)*, *Suter (supra)* and *Blessing (supra)* are good law, it is therefore appropriate to revisit the post-*Suter*, preamendment decisions in *Baby Neal v Casey* (821 F Supp 320, *revd on other grounds* 43 F3d 48) and *Eric L. v Bird* (848 F Supp 303). There, as here, the plaintiffs sought to avoid the holding in *Suter* by maintaining that their claims under other sections of AACWA were still viable since those sections were not specifically addressed by the Court in *Suter*. However, as noted by the District Court in *Baby Neal*, "The language of *Suter* is clear. Plaintiffs may not bring an action under the Adoption Act itself or 42 U.S.C. § 1983 for alleged failures of the Commonwealth to implement *any* feature

of its plan which has been approved by the Secretary" (*supra*, at 327; emphasis added).

The District Court also noted that the Supreme Court found that " 'The Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan approved by the Secretary which contains the 16 listed features' * * * [and that] '[T]he regulations promulgated by the Secretary to enforce the Adoption Act do not evidence a view that § 671 (a) places any requirement for state receipt of Federal funds other than the requirement that the State submit a plan to be approved by the Secretary' " (821 F Supp, *supra*, at 327, quoting *Suter v Artist M.*, *supra*, 503 US, at 358, 361).

Plaintiffs here, like the plaintiffs in *Eric L.* (*supra*), do not deny that New York has a plan approved by the Secretary which meets the 17 enumerated requirements. Instead, they argue that it is not in fact fulfilling its plan obligations and seek to force the State to do what it committed itself to do in its own plan. They claim that defendants failed to produce adequate case plans designed to reunite foster children with their families or provide them with permanent homes or failed to take steps to implement such plans. As found by the District Court in *Eric L.*, however, plaintiffs' claims, including one pursuant to paragraph (16) of section 671 (a), were foreclosed by the decision in *Suter* inasmuch as, like paragraph (15), each of the paragraphs relied upon is " 'merely another feature which the state plan must include to be approved by the Secretary,' and does not create an enforceable right." (*Eric L.*, *supra*, 848 F Supp, at 312, quoting *Suter v Artist M.*, 503 US, *supra,* at 359, n 10.) Thus, the IAS Court properly dismissed plaintiffs' claims under CAPTA and AACWA.

■ We also agree that the IAS Court correctly determined the issues regarding the timeliness of the Public Administrator's intervention in this action and properly allowed the intervention of the estate of Alan G.'s personal injury claims to relate back, pursuant to CPLR 203 (f), to the time when his siblings moved to intervene in this action (*Vastola v Maer*, 39 NY2d 1019, 1021; *United States v Randall & Blake*, 817 F2d 1188, 1192). Those personal injury claims met the requirements that they arose out of the same transactions and occurrences that gave rise to the preexisting plaintiffs' claims and that they are similar enough to the preexisting plaintiffs' claims such that defendants were placed on notice of the existence of the subsequent claims (*see, Manti v New York City Tr.*

*Auth.*, 146 AD2d 551, 552; *Key Intl. Mfg. v Morse/Diesel, Inc.*, 142 AD2d 448, 457-458; *Golub v Baer, Marks & Upham*, 172 AD2d 489, 490).

The court properly declined to apply the relation back doctrine to the estate's wrongful death claims, since none of plaintiffs' prior pleadings, including the intervening complaint of the G. children, provided defendants with notice of these essentially different claims (*Key Intl. Mfg. v Morse/Diesel, Inc.*, *supra*).

■ We disagree with the IAS Court's denial of that part of defendants' motion seeking to dismiss plaintiffs' claims pursuant to Social Services Law § 409 *et seq.* and modify the appropriate orders to grant such relief. Although in *Martin A. v Gross* (*supra*), we upheld plaintiffs' right to injunctive relief to ensure that plans were prepared for the provision of protective services to avoid their unnecessary placement in foster care, it does not necessarily follow that they are entitled to seek money damages caused by any failure to implement the plan. It is well settled that, where a statute does not make express provision for civil damages, recovery may be had only if a private right of action may fairly be implied (*Sheehy v Big Flats Community Day*, 73 NY2d 629, 633). In determining such issue, we must inquire whether plaintiffs are members of the class for whose particular benefit the statute was enacted; whether recognition of a private right of action would promote the legislative purpose; and, whether creation of such right would be consistent with the legislative scheme (*supra*, at 633-634 [citations omitted]). While plaintiffs certainly qualify under the first prong of the test and, as urged by the dissent, permitting civil damages might serve to ensure defendants' compliance with the statute, the legislative history of title 4 of article 6 of the Social Services Law (§ 409 *et seq.*) shows that the purpose of its enactment was to create a funding scheme providing enhanced reimbursement by the State as an incentive for local social services districts to provide preventive services for children and their families, not to impose civil liability for money damages upon local districts to compensate for their failure to provide such services.

■ As to plaintiffs' constitutional claims, their procedural due process claims based upon the protective services mandated in Social Services Law sections §§ 417 and 424 must fail unless they can show that the procedures in sections 417 and 424 were enacted pursuant to a substantive constitutional obligation to protect them from abuse or neglect (*Doe v District of*

*Columbia*, 93 F3d, *supra*, at 868). They fail to make such a showing.

Even if plaintiffs were able to allege an interest, the deprivation of which requires due process, they could not prevail because the question then arises as to what, if any, additional process is due. "[I]n a case such as this, where the alleged deprivation of liberty or property is not pursuant to an established state procedure, the existence of an adequate post-deprivation remedy under state tort law is all the process that is due". (*Doe v Fein, supra*, 93 F3d, at 868-869 [citations omitted]; *see also, Sinhogar v Parry*, 74 AD2d 204, 213, *appeal dismissed in part* 50 NY2d 1022.)

We agree that the G. children were entitled not to be returned to their abusive home environment without adequate procedural protection; however, there must be a threshold finding of need and eligibility made before a plan for preventive services is developed. Inherent in plaintiffs' claim of entitlement to such preventive services is the implication that the statute imposes a nondiscretionary duty on the part of social services officials to make the statutorily required finding under certain described circumstances. Such reasoning has already been rejected by this Court inasmuch as such professional evaluation as to the existence of a circumstance requiring child preventive services cannot reasonably be construed as ministerial or nondiscretionary (*Grant v Cuomo*, 130 AD2d 154, 167). Any "entitlement" sought to be enforced depends upon the decisions of social services professionals and does not even come into existence until the discretionary determination as to what is appropriate has been made (*Torres v Little Flower Children's Servs.*, 64 NY2d 119, 128, *cert denied* 474 US 864).

There is also no merit to the F. children's substantive due process claim. Although the Supreme Court, in *DeShaney v Winnebago County Dept. of Social Servs.* (489 US 189), specifically left open the question as to whether children whom the State removes from their homes and places in foster homes enter into a special relationship with the State giving rise to an affirmative right to protection, it strongly signalled that they did. Assuming, arguendo, such a "special relationship", it is still necessary to consider by what standard the State's conduct must be measured.

Merely negligent State conduct does not constitute a deprivation under the Due Process Clause (*Daniels v Williams*, 474 US 327, 331-336; *Davidson v Cannon*, 474 US 344, 347-348) and only recklessness or something greater can give rise to a

substantive due process violation (*Artist M. v Johnson*, 726 F Supp 690, 700, *affd* 917 F2d 980, *revd on other grounds sub nom. Suter v Artist M.*, 503 US 347, *supra,* citing *Archie v City of Racine*, 847 F2d 1211, 1220).

Plaintiffs allege violations of their constitutionally protected right to reasonable care and safety while in foster care, including both physical safety and emotional well being. However, even giving plaintiffs the benefit of all favorable inferences, nothing alleged suggests such total indifference on defendants' part to plaintiffs' physical and emotional safety as to give rise to a substantive due process claim (*supra*). Likewise, plaintiffs' State constitutional claims should also be dismissed. While the State Constitution (art XVII, § 1) mandates aid for the needy, the extent of such aid and the manner in which it is to be provided is left to the discretion of the Legislature (*Tucker v Toia*, 43 NY2d 1, 8), which has provided for such aid by enacting the very child welfare statutes in question here. As such, plaintiffs have no State constitutional claim independent from their claim under the Social Services Law.

█ Finally, although the City may, under certain circumstances, be answerable for injuries suffered by children in its charge (*see, Barnes v County of Nassau*, 108 AD2d 50, 54; *Bartels v County of Westchester*, 76 AD2d 517), whether plaintiffs can establish their claim of a special relationship with or a duty owed to them by defendants is generally a question for a jury to decide (*De Long v County of Erie*, 60 NY2d 296, 306). Thus, while we agree that plaintiffs should be permitted to pursue any common-law tort claims they may have for alleged physical and emotional injuries suffered while in foster care, the issue of whether or not there is a special relationship should be left for determination by the trier of fact. We would also note, as Justice White did, in *Boland v State of New York* (218 AD2d 235, 249 [concurring in part and dissenting in part]), that the adoption of the majority's rule in that case, which overlooks the four elements necessary to invoke the special relationship rule (*see, Cuffy v City of New York*, 69 NY2d 255, 260), greatly expands the scope of the State's or City's duty to abused or neglected children and exposes them to potential and additional liability in this area and others (e.g., abuse and neglect of the elderly) where the State has statutorily undertaken to provide protective services for its citizens.

Therefore, despite the tremendous problems facing the child welfare system and the need for improvement in the provision of preventive services, where Congress or the Legislature has

not explicitly or implicitly provided for a private cause of action to enforce a particular statute and plaintiffs have withdrawn their claims for injunctive and declaratory relief, they must depend upon traditional State tort theories in order to recover any monetary damages for their present claims (*see, DeShaney v Winnebago County Dept. of Social Servs., supra*, at 203).

Accordingly, the order of Supreme Court, New York County (Walter Tolub, J.), entered June 3, 1996, which granted defendants' motion for leave to amend their answer to the intervening complaint of the Bronx Public Administrator to assert the affirmative defense of the Statute of Limitations and for summary judgment thereon dismissing all causes of action of the Public Administrator on behalf of the estate of Alan G., to the extent of dismissing, with prejudice, the first, third, fifth and seventh causes of action sounding in wrongful death, should be affirmed, without costs.

Order, same court and Justice, entered June 28, 1996, which granted defendants' motion to reargue the court's decision, dated May 17, 1996, which had held that the personal injury claims asserted by the estate of Alan G. related back to the commencement of the action by his siblings and were timely interposed and, upon reargument, modified its decision to reflect that the estate's personal injury claims relate back to April 1991 when the G. children moved to intervene in the pending actions and were timely interposed, should be affirmed, without costs.

Order, same court and Justice, entered July 3, 1996, which, in the G. family action, granted defendants' motion for partial summary judgment and dismissed, with prejudice, the claims in the second amended complaint, the intervening complaint of Mark, Kevin, Steven and Susan G., and the intervening complaint of the Bronx Public Administrator on behalf of the estate of Alan G., except the eighteenth cause of action in which Mark, Kevin, Steven and Susan G. allege violations of Social Services Law § 409 *et seq.* and § 411 *et seq.* due to defendants' alleged failure to promulgate a plan as mandated by the Social Services Law; the twentieth and twenty-first causes of action in which plaintiffs Mark, Kevin, Steven and Susan G. allege violations of article XVII of the State Constitution based on defendants' alleged failure to promulgate a plan mandated by the Social Services Law; the first, second, third and fourth causes of action in the intervening complaint of the Bronx Public Administrator in which he alleges violations of Social Ser-

vices Law § 409 *et seq.* and § 411 *et seq.*, and article XVII of the State Constitution based solely on defendants' alleged failure to promulgate a plan, conduct investigations, and provide services in the time and manner mandated by the Social Services Law, should be modified, on the law, defendants' motion further granted and plaintiffs' claims insofar as they allege violations of Social Services Law § 409 *et seq.* and article XVII of the State Constitution should be dismissed, and otherwise affirmed, without costs.

Order, same court and Justice, entered July 11, 1996, which granted defendants' motion for partial summary judgment and dismissed, with prejudice, the claims in the second amended complaint, except the claim in the tenth cause of action in which plaintiffs Martin, Bill, Laura and Vincent A. allege violations of Social Services Law § 409 *et seq.* and article XVII of the State Constitution based upon defendants' alleged failure to promulgate a plan mandated by the Social Services Law, should be modified, on the law, defendants' motion further granted and plaintiffs' claims under the tenth cause of action, insofar as they allege violations of Social Services Law § 409 *et seq.* and article XVII of the State Constitution, should be dismissed, and otherwise affirmed, without costs.

Order, same court and Justice, entered July 9, 1996, which granted defendants' motion for partial summary judgment and dismissed, with prejudice, the B. family's claims in the second amended complaint, except the claims alleging violations of Social Services Law § 409 *et seq.* and article XVII of the State Constitution based on defendants' alleged failure to promulgate a plan mandated by the Social Services Law, should be modified, on the law, and defendants' motion further granted and plaintiffs' claims under the tenth and fourteenth causes of action, insofar as they allege violations of Social Services Law § 409 *et seq.* and article XVII of the State Constitution, should be dismissed, and otherwise affirmed, without costs.

The order of the same court and Justice, entered July 9, 1996, which granted defendants' motion for partial summary judgment and dismissed, with prejudice, the claims in the second amended complaint, except the seventeenth cause of action in which Frances and John F. allege violations of Social Services Law § 409 *et seq.* based upon defendants' alleged failure to promulgate a plan mandated by the Social Services Law, should be modified, on the law, defendants' motion further granted and plaintiffs' claims insofar as they allege violations of Social Services Law § 409 *et seq.* should be dismissed, and otherwise affirmed, without costs.

WILLIAMS, J. (dissenting in part). While I concur in part with the majority view as to plaintiffs' claims, there are areas in which I believe the majority view to be in error.

The plaintiffs' claims pursuant to the Adoption Assistance and Child Welfare Act of 1980 (AACWA; 42 USC §§ 620-628, 670-679a) provisions at 42 USC § 671 (a) (16) and § 675 (1) and (5) (B) are viable, despite the majority's conclusion to the contrary. The majority relies on *Suter v Artist M.* (503 US 347) to defeat these claims; however, when *Suter* is read through the prism of the 1994 amendment of 42 USC § 1320a-2 and *Blessing v Freestone* (520 US 329, 117 S Ct 1353), it is clear that *Suter*'s suggestion that none of the paragraphs of section 671 (a) could support a private right of action[1] is either dictum or the precise type of sweeping "analysis" for which the *Blessing* Court criticized the Ninth Circuit and to which Congress responded by enacting the amendment.

The test for determining whether a Federal statute creates a private right of action pursuant to 42 USC § 1983 is articulated in *Wilder v Virginia Hosp. Assn.* (496 US 498). Beginning with the holding in *Maine v Thiboutot* (448 US 1, 4) that "§ 1983 provides a cause of action for violations [by State agents] of federal statutes as well as the Constitution", the *Wilder* Court (at 508) cites two exceptions to that rule: where " 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983' " or where " 'Congress has foreclosed such enforcement of the statute in the enactment itself' " (quoting *Wright v Roanoke Redevelopment & Hous. Auth.*, 479 US 418, 423). In determining whether an enforceable Federal right has been created, the *Wilder* test asks whether the provision is intended to benefit the plaintiff; if so, an enforceable right is created provided the statute also creates a binding obligation on the State, as opposed to merely

---

1. Footnote 10 of *Suter (supra,* at 359) states:

"Respondents also based their claim for relief on 42 U.S.C. § 671 (a) (9) which states that the state plan shall 'provid[e] that where any agency of the State has reason to believe that the home or institution in which a child resides whose care is being paid for in whole or in part with funds provided under this part or part B of this subchapter is unsuitable for the child because of the neglect, abuse, or exploitation of such child, it shall bring such condition to the attention of the appropriate court or law enforcement agency * * *.'

"*As this subsection is merely another feature which the state plan must include to be approved by the Secretary, it does not afford a cause of action to the respondents anymore than does the 'reasonable efforts' clause of § 671 (a) (15).*" (Emphasis added.)

reflecting a Congressional preference, and provided the statute is not so vague and amorphous as to be judicially unenforceable (*Wilder v Virginia Hosp. Assn., supra,* at 509). The initial burden belongs to plaintiffs to establish these criteria, and if they are successful, it then switches to the State to demonstrate contrary Congressional intent (*Wright v Roanoke Redevelopment & Hous. Auth., supra*). Such demonstration requires a showing, *inter alia,* that Congress provided " 'a comprehensive enforcement mechanism for the protection of the federal right' " (*Marisol A. v Giuliani,* 929 F Supp 662, 681, quoting *Harris v James,* 883 F Supp 1511, 1518, *revd on other grounds* 127 F3d 993) superior to or inconsistent with an action under section 1983, but which must consist of more than the mere availability of administrative relief (*supra*).

Subsequent to *Wilder,* the Supreme Court sought to further refine this test in *Suter v Artist M.* (503 US 347, *supra*) and *Blessing v Freestone* (520 US 329, 117 S Ct 1353, *supra).* In those cases, the Court emphasized, among other things, the need for careful scrutiny of the provision in question, in light of the entire enactment, and rigorous application of each of the *Wilder* criteria to the claimed rights and statutes at issue.

The question in *Suter* was whether Congress unambiguously conferred upon plaintiffs the right to enforce section 671 (a) (15) of the AACWA, a provision which requires the State to make "reasonable efforts" to preserve and reunite families. The Court held that it did not. The Court appeared to rely, without express acknowledgment, upon a version of the *Wilder* analysis that, among other things, featured a heightened emphasis on the contractual analogy noted in *Pennhurst State School v Halderman* (451 US 1, 17),[2] blurred the distinction between the two exceptions to *Maine v Thiboutot (supra)* by suggesting that the existence of an alternative enforcement mechanism may be relevant to whether the statute creates rights enforceable by section 1983 as opposed to the issue of whether Congress precluded a section 1983 remedy in the statute itself (*Suter v Artist M., supra,* at 360-361 [majority opn], 375-376 [Blackmun, J., dissenting]; Note, *Suter v. Artist M. And Statutory Remedies Under Section 1983: Alteration Without Justification,* 71 NC L Rev 1171, 1197-1198), and appeared to shift the

---

**2.** The legitimacy of Congress' power to legislate pursuant to its spending power depends on the State's knowing and voluntary acceptance of the terms upon which a grant of Federal funds is made. Thus, as in a contractual relationship, any term or condition Congress imposes on the grant must be unambiguous.

burden of production from defendants to plaintiffs with regard to demonstrating Congressional intent to permit section 1983 relief (*Suter v Artist M., supra,* at 376 [dissenting opn]; 71 NC L Rev, *op. cit.,* at 1200-1201). The Court concluded that with regard to a statute, such as AACWA, enacted by Congress pursuant to its spending power, a private right of action could exist only where Congress' intent to create one was unambiguous. It read the statute as requiring only that the State have a Federally approved plan that "provides that * * * reasonable efforts" be made at preserving or reunifying the home, but as otherwise unspecific as to how the plan would be implemented, leaving the State broad discretion in that regard; consequently, the statute was found to be too vague to be judicially enforceable. It read section 671 (a) (3)'s related language, that the State plan "provide[ ] that the plan shall be *in effect* in all political subdivisions of the State, and, if administered by them, be mandatory upon them" (emphasis added), narrowly to mandate only that the plan apply to such subdivisions, not that it need be enforced. Although the only claims before the Court were pursuant to section 671 (a) (9) and (15), in footnote 10 of the opinion (*see, supra,* n 1) it strongly suggested that *none* of the 17 paragraphs of section 671 (a) could support a private right of action. Finally, the Court repeatedly emphasized the importance of careful review of the statutory language at issue in the context of the entire act.

In a probing, strongly worded dissent, Justice Blackmun analyzed section 671 (a) (15) within the framework established by the Court in *Wilder (supra)* and its antecedents and found that the statute supported a private right of action pursuant to section 1983, that the majority departed from such precedents without acknowledgment, explanation or justification and that the majority's purported distinction between the statute at issue in *Wilder* and that at issue in *Suter* was nonexistent for section 1983 purposes.

In my view, *Suter* was, among other things, a result-oriented attempt to seriously restrict access to private enforcement of Federal statutes by way of section 1983. While *Suter* is basically grounded in *Wilder* and its antecedents and perhaps reaches the correct result as to 42 USC § 671 (a) (15), it created a great deal of confusion among the lower courts regarding the exact nature of its holding, due to its dicta, its failure to expressly reference and follow the *Wilder* analysis and its failure to clearly state how it was attempting to refine *Wilder* (71 NC L Rev, *op. cit.,* at 1201-1202).

*Suter* was decided in 1992. In 1994, Congress amended 42 USC § 1320a-2 to state, in relevant part: "In an action brought to enforce a provision of this chapter [which includes the AACWA and the CAPTA], such provision is not to be deemed unenforceable because of its inclusion in a section of this chapter requiring a State plan or specifying the required contents of a State plan. This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., [503 US 347,] 112 S.Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section 671 (a) (15) of this title is not enforceable in a private right of action." Congress' intent in enacting the amendment was to: "assure that individuals who have been injured by a State's failure to comply with the Federal mandates of the State plan titles of the Social Security Act are able to seek redress in the federal courts to the extent they were able to prior to the decision in *Suter v Artist M.*" (HR Rep No. 6, 140 Cong Rec H10250 [Sept. 28, 1994]).

Several courts have found that the amendment forecloses a reading of *Suter* that would preclude section 1983 enforcement of a provision in a State plan statute merely because it was included in such a statute (*see, Harris v James*, 127 F3d 993, 1002-1003, *supra; Doe v District of Columbia*, 93 F3d 861, 876; *Value Behavioral Health v Ohio Dept. of Mental Health*, 966 F Supp 557, 567; *Norman v McDonald*, 930 F Supp 1219, 1227-1228). Some opine that it limits *Suter* to its facts and/or returns the law to its pre-*Suter* (*Wilder*) state (*Visiting Nurse Assn. v Bullen*, 93 F3d 997, 1003, *cert denied* 519 US 1114; *Stanberry v Sherman*, 75 F3d 581, 583-584; *Vogelsang v Cayuga County*, 1998 US Dist LEXIS 3848 [ND NY, Mar. 25, 1998, Pooler, J.]; *Messier v Southbury Training School*, 916 F Supp 133, 143). The confusion regarding the interpretation of this amendment is a direct reflection of the confusion engendered by the *Suter* decision itself.

In *Blessing v Freestone (supra)*, a 1997 decision, the issue was whether provisions in title IV-D of the Social Security Act create enforceable Federal rights, via section 1983, in parents of children entitled to receive child support services from the State of Arizona. Title IV-D, part of the Aid to Families with Dependent Children (AFDC) program, requires that States

seeking to qualify for Federal AFDC funds must certify that their child support enforcement programs conform with the title's numerous requirements. The Court, expressly relying on *Wilder (supra)*, unanimously reversed the Ninth Circuit's decision in favor of plaintiffs, holding that they failed to establish that title IV-D gave them individually enforceable Federal rights. The Court held that plaintiffs, for the most part, failed to sufficiently specify the rights they were claiming and the statutory provisions supporting such claims, and that the Ninth Circuit failed to conduct the required "methodical inquiry" to determine whether the claims and corresponding provisions satisfied the *Wilder* test (*supra, 520 US, at 343*). The Court, in addition, offered a refinement to the first criterion of the *Wilder* test in that it distinguished between statutory intents to benefit plaintiff directly or indirectly. A private right of action would be found only if the provision evidenced an intent to benefit plaintiff as an individual, i.e., directly, as opposed to conferring benefits by improving the over-all efficiency of the system, i.e., indirectly.

The Court did examine several claims it was able to discern from the Ninth Circuit decision and the complaint. It found the statute's "substantial compliance" requirement to be primarily an indicator by which the Secretary of Health and Human Services could determine whether a State's program was performing as required, and thus only indirectly linked to the services received by individuals such as plaintiffs. Hence it found that the intended remedy for substantial noncompliance was for the Secretary to increase the frequency of audits and reduce the State's Federal grant, not a private right of action. Using the same rationale, the requirement of sufficient staffing levels was rejected as a basis for private enforcement. Despite the Court's rejection of plaintiffs' claims based on these operational requirements and of the Ninth Circuit's blanket analytical approach to the question of rights under title IV-D, it specifically declined to foreclose the possibility that some title IV-D provisions might give rise to private rights of action (*Blessing v Freestone, supra, 520 US, at 345*). The case was remanded to the District Court to specifically identify the remainder of plaintiffs' claims and the corresponding statutory provisions and to review them pursuant to *Wilder (supra)*.

*Blessing* artfully calmed the waters roiled by *Suter (supra)*. It reanchored this area of section 1983 jurisprudence in the pre-*Suter* precedents, accomplished, to a degree, the Supreme Court's not-so-hidden agenda of restricting the private enforce-

ment of Federal rights pursuant to section 1983, quietly addressed the Congressional concerns that resulted in the amendment, and, generally, cleared up most of the detritus and uncertainty created by *Suter*, wisely citing it only for limited purposes.

The Eleventh Circuit in *Harris v James* (127 F3d 993, 1004, *supra*) noted that the state of the law in this area, in the wake of *Suter*, the amendment and *Blessing*, would seem to be: "First, the holdings of *Wright, Wilder,* and *Suter* all remain good law. Second, the three-prong 'enforceable rights' test developed in *Wright* and *Wilder* remains good law. Finally the Supreme Court's admonitions in *Suter* which fall short of proposing that State-plan statutes are *a fortiori* unenforceable under § 1983 remain good law". I would add that the *Harris* court's reference to State plan statutes should specifically mention the paragraphs of section 671 (a) not at issue in *Suter*.

In the matter before us, the majority cites *Baby Neal v Casey* (821 F Supp 320, *revd on other grounds* 43 F3d 48) and *Eric L. v Bird* (848 F Supp 303) for the proposition that "The language of *Suter* is clear. Plaintiffs may not bring an action under the Adoption Act itself or 42 U.S.C. § 1983 for alleged failures of the Commonwealth to implement *any* feature of its plan which has been approved by the Secretary" (*Baby Neal v Casey, supra,* at 327 [emphasis added]). However, this view, based upon footnote 10 of *Suter*, is unpersuasive for several reasons. First, footnote 10 appears to be dictum, since the remaining paragraphs of section 671 (a), including paragraph (16), are not at issue in *Suter*. Second, it predates the 1994 amendment and runs contrary to the amendment's express prohibition against a fortiori section 1983 unenforceability of State plan provisions. Third, it violates *Blessing*'s admonitions against sweeping, unmethodical determination of whether a State plan statute creates private enforceable rights, which the Court underlined with its pointed refusal to "foreclose the possibility that some provisions of [the statute at issue there] give rise to individual rights." (*Blessing v Freestone, supra,* 520 US, at 345.)

It is plaintiffs' contention that they have viable claims arising from defendants' failure to comply with section 671 (a) (16), and section 675 (1) and (5) (B), by failing to produce, for the children in foster care, legally mandated case plans designed to either reunite the children with their families or to provide the children with permanent homes, or, where such a plan was produced, failing to take steps to implement it. Section 671 (a)

(16) is one of a list of 17 required features for State plans seeking to qualify for Federal funding. Section 675 (1) and (5) (B) define the terms "case plan" and "case review system" mentioned in section 671 (a) (16). The provisions read in relevant part as follows:

"§ 671. State plan for foster care and adoption assistance

"(a) Requisite features of State plan

"In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which * * *

"(16) provides for the development of a case plan (as defined in section 675 (1) of this title) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in section 675 (5) (B) of this title with respect to each such child".

"§ 675. Definitions

"As used in this part or part B of this subchapter:

"(1) The term 'case plan' means a written document which includes at least the following:

"(A) A description of the type of home or institution in which a child is to be placed, including a discussion of the safety and appropriateness of the placement * * *

"(B) A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own home or the permanent placement of the child * * *

"(C) To the extent available and accessible, the health and education records of the child * * *

"(5) The term 'case review system' means a procedure for assuring that * * *

"(B) the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review".

The issue is whether Congress unambiguously conferred upon the child beneficiaries of section 671 (a) (16) a right to enforce the requirements that the State provide for the development of a case plan for each child receiving foster care maintenance payments and provide a case review system meeting certain specifications with respect to each such child.

When reviewed in accordance with the principles set forth in, *inter alia*, *Blessing (supra)* and the amendment, I find that

section 671 (a) (16) does create a Federal right enforceable under 42 USC § 1983. With reference to the first *Wilder* criterion, the statute is clearly intended to benefit plaintiffs directly, since it purports to provide a case plan consisting of specified elements and a case status review within a specific time frame for each child receiving support payments (*see, Blessing v Freestone, supra,* 520 US, at 345 [compare the discussion regarding the staffing-levels provision, which was found to be too indirectly beneficial to create an enforceable right, to that regarding the child-support collection pass-through provision, which the Court strongly suggests would create an enforceable right]; *see also, Marisol A. v Giuliani, supra,* at 683; *Jeanine B. v Thompson,* 877 F Supp 1268, 1283-1284, *reconsidered and mod on other grounds* 967 F Supp 1104).[3] As for the second criterion, the statutory language places a binding obligation on the State, the mandate being that the State, in order to qualify for Federal funding, provide an approved plan that provides the described case plan and case review system (*Marisol A. v Giuliani, supra,* at 683; *Jeanine B. v Thompson, supra,* at 1283-1284; *see, Suter v Artist M., supra,* at 358). The third *Wilder* criterion, whether the statutory language is too vague and amorphous for judicial enforcement, must be answered in the negative. Section 671 (a) (16), in conjunction with the definitions at section 675 and the accompanying regulations at 45 CFR 1356.21 (c) and (d), clearly sets forth requirements for the case plan and case review system. For example, the case plan must be a written document, must be prepared within 60 days and must include, *inter alia,* a description of the services offered and provided to prevent removal of the child from the home. The case review system must assure, *inter alia,* that each child has a case plan consistent with his best interest, in specified areas, and his special needs, and that the child's status is judicially or administratively reviewed at least every six months with regard to several specified concerns.

Accordingly, I would reinstate plaintiffs' AACWA claims.

As for plaintiffs' remaining claims, I would also find viable the G. family's claims under various sections of the State Social

---

**3.** At 967 F Supp 1104, the court, in light of *Blessing,* reconsidered its prior decision that CAPTA (42 USC) § 5106a (b) was privately enforceable; it directed (at 1119) the parties to submit briefs on the question of whether reconsideration was also warranted of its prior holding that sections of AACWA, including 42 USC § 671 (a) (16), were privately enforceable. To date, no decision on that issue has been reported.

Services Law and their negligence claims based on the theory that a special relationship was created, as well as certain of the F. family's claims under the Social Services Law and the State Constitution.

The G. family claims that defendants violated various sections of the State Social Services Law as follows: section 424 (6) (failure to conduct investigations within the 24-hour notice period); section 424 (7-a) (failure of case worker to timely respond and to timely file 90-day follow-up reports); section 424 (13) (failure to provide protective services to train and enable the mother to care for her children, and when services were provided, failure to monitor the mother to make certain that she complied with conditions imposed); section 417 (1) (a) and section 424 (9) (failure to remove children from home upon determination that their well-being was at risk); and section 417 (2) (failure to protect children's health by returning them to filthy and abusive home environment without imposing statutory safeguards to ensure against subsequent risk). These claims involve the failure of defendants to provide specific, statutorily mandated, nondiscretionary services, i.e., timely initial investigations of reports of abuse or neglect and timely subsequent monitoring and follow up of the situation, and the failure led directly to the injuries suffered by plaintiffs, thus giving rise to private rights of action (*Klostermann v Cuomo*, 61 NY2d 525; *Grant v Cuomo*, 130 AD2d 154, *affd* 73 NY2d 820).

The G. family, not Alan G. only as the motion court held, would also appear to have grounds for holding defendants liable for acts of negligence on the theory that a special relationship was created. The basis for such a relationship was arguably established when the caseworkers responded to complaints, and investigated and documented the unhealthy home environment and the obvious indications of physical abuse, but failed to initiate or maintain appropriate measures to safeguard the children's welfare (*see, Nowlin v City of New York*, 81 NY2d 81; *Kircher v City of Jamestown*, 74 NY2d 251; *De Long v County of Erie*, 60 NY2d 296; *Florence v Goldberg*, 44 NY2d 189; *Boland v State of New York*, 218 AD2d 235; *Rodriguez v City of New York*, 189 AD2d 166, 178). This conduct would appear to speak to the first three elements of a special

relationship.[4] I am also of the view, the City's contentions notwithstanding, that sufficient legal authority exists to support the inference that the children justifiably relied on the City's clear assumption of responsibility for their well being (*Boland v State of New York, supra*, at 241 [Social Security Law, article 6, title 6's "extensive and detailed statutory scheme" sufficiently establishes the third and fourth necessary elements of a special relationship]; *see also, Barnes v County of Nassau*, 108 AD2d 50, 54 ["a State or its subdivisions may be answerable for injuries suffered by children as a result of negligence in the placement or supervision of children in their charge"]; *Bartels v County of Westchester*, 76 AD2d 517, 521-522 ["one assuming to act, though not under a duty, must act with care, especially when looking after children"]). The special relationship theory would also pertain where the children were removed from their home into the City's custody and were subsequently returned to that abusive environment without complying with the statutorily mandated protective procedures. Having stated all the above, we are of course mindful that the existence of a special relationship is generally a question for the trier of fact (*De Long v County of Erie*, 60 NY2d 296, 306, *supra*) and should be so here.

Thus, the motion court's dismissal of the G. children's claims, both those pursuant to the Social Services Law provisions cited above and those arising from their special relationship with defendant City, was error, and those claims should be reinstated.

The F. children were repeatedly removed illegally from their home (Family Ct Act §§ 1021-1024) without any initial determination of whether removal was appropriate, or any development of a plan to keep the family together, contrary to mandated, nondiscretionary procedures (Social Services Law §§ 409-e, 409-a). This failure to provide any of the preventive services the family needed and was entitled to was particularly egregious here, where, for instance, the obvious need for communication services was never addressed despite the caseworker's awareness of the mother's deafness and the problem it

---

4. The requirements for creation of a special relationship are: "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Cuffy v City of New York*, 69 NY2d 255, 260).

caused in caring for the children; indeed, it was his justification for removing the children. Where there is such failure to make a mandated initial determination as to the need for services, a privately enforceable right should exist.

Finally, the right to substantive due process guarantees an individual's right to be free from harm while in State custody (*see, Youngberg v Romeo*, 457 US 307, 315-316; *Society for Good Will to Retarded Children v Cuomo*, 737 F2d 1239, 1245-1246; *Doe v New York City Dept. of Social Servs.*, 649 F2d 134, 141; *Yvonne L. v New Mexico Dept. of Human Servs.*, 959 F2d 883, 890-894; *Norfleet v Arkansas Dept. of Human Servs.*, 989 F2d 289, 291-293; *Matter of Ford v Civil Serv. Empls. Assn.*, 94 AD2d 262, 264-265, *lv dismissed* 62 NY2d 799). This freedom from harm includes physical harm and, arguably, psychological or emotional harm (*see, Marisol A. v Giuliani, supra*, at 675, citing *B.H. v Johnson*, 715 F Supp 1387, 1395; *Aristotle P. v Johnson*, 721 F Supp 1002, 1009-1010; *Doe v New York City Dept. of Social Servs.*, 670 F Supp 1145, 1175-1176), subject, of course, to evidentiary proof. The breadth of the protection and care need not be optimal (*see, Baby Neal v Casey, supra*, at 337; *B.H. v Johnson, supra,* at 1397-1398; *Del A. v Roemer*, 777 F Supp 1297, 1319-1320), but, at a minimum, must include the bare essentials of food, shelter, clothing and medical care (*Youngberg v Romeo, supra*, at 324) and must bear a reasonable relationship to the purpose of the custody, which in the child welfare context is " 'to further the best interest of children' " (*Marisol A. v Giulani, supra*, at 676, quoting *Doe v New York City Dept. of Social Servs.*, 670 F Supp 1145, 1174; *Jackson v Indiana*, 406 US 715, 738).

Given these principles, there is legal merit in the F. children's substantive due process claim. The repeated displacement and the abuse the F. children allegedly suffered while in foster care would constitute a violation of their rights, provided an evidentiary nexus between foster care and the injuries can be established at trial and no intervening causation is shown to relieve the City of liability.

In New York City, every few weeks we hear another story about a child dead as a result of child abuse, often in foster homes. Countless others of whom we never hear are undoubtedly being harmed. Obviously, many, if not most, of these incidents are not the result of municipal misfeasance, malfeasance or nonfeasance. Often, however, we hear of incidents that were avoidable had those charged with responsibility performed their duties in reasonable compliance with the for-

midable phalanx of laws and procedures, such as those at issue, which we have implemented at a cost of millions of dollars.

It is a harsh fact that despite the lofty moral and practical reasons to protect and nurture our children, resort to the sanction of monetary damages is probably the most effective means of both attempting to restore to these children some measure of what has been taken from them and forcing those entrusted with safeguarding children's lives to fulfill their duties. The nature of our society is that pecuniary incentives are perhaps the most powerful of all. There is no question that the resulting municipal exposure to liability might be enormous and that, in some cases, the putative claimants or beneficiaries of such claims might bear responsibility for some of the claimed injuries. But these concerns can be addressed. Why can't these laws be administered as intended? Otherwise, how else may these children be helped? Unfortunately, if pressure is not exerted to remedy these problems at this point, the thousands of damaged children will become a generation of damaged adults who will cost us infinitely more in dollars or any other measure we might choose, and will engender succeeding generations of similarly damaged individuals.

Thus, where Congress sees fit to enact these child welfare statutes and has in place a mechanism for their private enforcement, and the States accept the funding, put the required laws on the books, but fail to properly effectuate them, it would seem to be the clear function of the courts to maximize rather than restrict access for the adjudication of the resulting claims. Instead, the trend has been to render these laws ineffectual with decisions that do not allow these children or their representatives to enforce them when they have the greatest need for enforcement, i.e., when those charged with enforcement have failed. It is the type of situation to which detractors of our justice system point in order to show how politics and socioeconomic status typically render the law unjust and unworthy of respect. How can we be content to offer only illusory protection to these helpless, but crucial, members of our society?

SULLIVAN, J. P., and MILONAS, J., concur with ANDRIAS, J.; RUBIN and WILLIAMS, JJ., dissent in part in a separate opinion by WILLIAMS, J.

Orders, Supreme Court, New York County, entered June 3, 1996 and June 28, 1996, affirmed; order, same court and Justice, entered July 3, 1996, modified, on the law, defendants'

motion for partial summary judgment further granted, and plaintiffs' claims, insofar as they allege violations of Social Services Law § 409 *et seq.* and article XVII of the NY Constitution, dismissed, and otherwise affirmed; order, same court and Justice, entered July 11, 1996, modified, on the law, defendants' motion for partial summary judgment further granted, and plaintiffs' claims under the tenth cause of action, insofar as they allege violations of Social Services Law § 409 *et seq.* and article XVII of the NY Constitution, dismissed, and otherwise affirmed; order, same court and Justice, entered July 9, 1996, modified, on the law, defendants' motion for partial summary judgment further granted, and plaintiffs' claims under the tenth and fourteenth causes of action, insofar as they allege violations of Social Services Law § 409 *et seq.* and article XVII of the NY Constitution, dismissed, and otherwise affirmed; and order, same court and Justice, entered July 9, 1996, modified, on the law, defendants' motion for partial summary judgment further granted and plaintiffs' claims, insofar as they allege violations of Social Services Law § 409 *et seq.,* dismissed, and otherwise affirmed, all without costs.