921 A.2d 196

**Corey PENDLETON**

v.

**STATE of Maryland.**

**No. 31 Sept. Term, 2005.**

Court of Appeals of Maryland.

April 13, 2007.

450

Michael P. Lytle (Byron L. Warnken of Warnken, LLC, on brief), Towson, MD, for Appellant.

Beth Mellen Harrison, Debra Gardner, Baltimore, MD, brief of Appellant Amici Curiae Public Justice Center, Advocates for Children and Youth, and the Juvenile Law, Children's Issues & Legislative Advocacy Clinic of the University of Maryland School of Law.

David E. Beller, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of MD and Carol Ann Smith, Asst. Atty. Gen., on brief), Baltimore, MD, for Appellees.

Argued Before BELL, C.J., RAKER, WILNER *, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, Chief Judge.

This case arises from the granting of a motion to dismiss by the Circuit Court for Baltimore City. On December 12, 2002, Corey Pendleton, the appellant, by and through his next friend and father, Randy Pendleton, filed in that court a complaint against the State of Maryland and the Baltimore City Department of Social Services (DSS), an agency of the State, (collec-

---

* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

tively the appellees, hereinafter referred to as "the State" or "the State Defendants"), and Barnett and Cecelia Carroll, d/b/a Finding Direction, Inc., alleging their negligence. The complaint also alleged battery with respect to James Wratchford, the appellant's roommate. The appellant subsequently amended his compliant to add Finding Direction, Inc., as a defendant. The gravamen of the complaint was that the appellant was sexually and physically abused and battered by his roommate while he was residing in a group home licensed by the State.

On May 23, 2003, the State filed a motion to dismiss the amended complaint for failure to state a claim.[1] That motion was granted as to the State Defendants, the State of Maryland and DSS, but not as to the other defendants. When they failed to answer the complaint, the Circuit Court entered a default judgment against them and subsequently, after an inquisition hearing on damages, assessed damages at $597,000.00. Judgment in that amount was entered in favor of the appellant against the defendants Barnett and Cecelia Carroll, d/b/a Finding Direction, Inc., and Finding Direction, Inc. The appellant appealed the Circuit Court's judgment dismissing the State Defendants from the case. This Court, on its own initiative and before proceedings in the Court of Special Appeals, issued a writ of certiorari, *Pendleton v. State,* 387 Md. 465, 875 A.2d 769 (2005), to address the single issue posed by the appellant:

> "Whether the trial court erred in granting the State Defendants' Motion to Dismiss, finding that the State had only a public duty of care, rather than a special or statutory duty to protect a child removed from the custody of his parents

---

1. Maryland Rule 2–322 provides, in relevant part:

 "(b) Permissive. The following defenses may be made by motion to dismiss filed before the answer, if an answer is required: (1) lack of jurisdiction over the subject matter, (2) failure to state a claim upon which relief can be granted, (3) failure to join a party under Rule 2–211, (4) discharge in bankruptcy, and (5) governmental immunity. If not so made, these defenses and objections may be made in the answer, or in any other appropriate manner after answer is filed."

and placed in the custody of a foster group home from the intentional acts of a third party[ ]"

We shall hold that the trial court did not err in dismissing the appellant's amended complaint, which insufficiently alleged a duty on the part of the State.

## I.

In October 1999, the appellant and his mother, Cynthia Mason, being homeless, were placed in a temporary shelter by DSS. Subsequently, in early January 2000, when he was ten years old, the appellant was removed from his mother's custody and placed in foster care. His placement was with Finding Direction, Inc., a licensed residential childcare provider in Baltimore City, operated by Barnett and Cecelia Carroll. The appellant was assigned to share a room in the residential group home with James Wratchford, then sixteen years old, another resident in the group home. The appellant alleges that he was sexually and physically abused and battered by Wratchford while they shared that room.

The appellant did not report the alleged abuse immediately, as he testified at the inquisition hearing on damages. According to the appellant's testimony at that hearing, he first reported the alleged abuse to a friend, who also lived in the group home. He then explained:

"Q When you told your friend and your friend told the foster care folks—

A Yes.

Q -what did they do?

A They took me down stairs and talked to me alone about it.

Q Did you tell them the truth?

A Yes, I told them the truth.

Q And then what did they do?

A Then the police came. They wrote up a report.

Q How much time went by-how much time went by be-
tween the start of the sexual assault and the time you
told?

A I have to think on that one. I'm not going to truly say I
really know, but I'm going to say around like a month or
something.

Q Did it seem to you like it was a long time?

A Yes.

Q Did it seem like it was short?

A It seemed like a little long.

Q But you think maybe about a month?

A Yeah.

Q And then after you told and the police came, it didn't
happen anymore.

A. No."

Once the operators of the group home were notified of the
situation, they acted to assure that there was no further
contact between the appellant and Wratchford. The appellant
was removed from the group home in February 2000 and
reunited with his mother.

The appellant's mother, pursuant to the Maryland Tort
Claims Act, Maryland Code (1984, 2004 Repl. Vol.), § 12–107
of the State Government Article, timely filed ' notice of the
appellant's claim with the State. It was denied. By this time,
the appellant's mother had passed away and Randy Pendleton,
the appellant's father, had custody of the appellant. He filed,
as next friend and father, a complaint on behalf of the
appellant, which he later amended to add Finding Directions,
Inc., as a defendant.

The complaint sounded in negligence. As relevant to the
State Defendants, it alleged that the State "owed a duty to
[the appellant] to keep him safe from harm while he was
housed at Finding Direction and to make certain the policies
designed to protect him were followed," but that the State
Defendants "breached their duties of care" by: (1) placing

Wratchford, a sixteen year old, in the same room with the appellant, a ten year old, (2) failing properly to supervise Wratchford, (3) failing to protect the appellant from being sexually and physically assaulted by Wratchford, (4) failing to provide adequate staffing for proper supervision of the appellant, (5) failing properly to train staff persons, and (6) failing to protect the appellant from the foreseeable risk of harm associated with being placed in the group home run by Finding Directions, Inc. As a result of the State Defendants' alleged breach of duty, the appellant claimed that he suffered "humiliation, shame, embarrassment, anger, physical and emotional pain, suffering, inconvenience, mental anguish, loss of emotional enjoyment of life, severe and extreme emotional distress, and incurred medical expense." The State Defendants' breach of duty, he maintained, was the proximate cause of his injuries and damages.

The only allegation of fact the appellant made with regard to the knowledge the State Defendants had of the situation or with which it was charged was:

"Upon information and belief, the State and its Foster Care Program officials as well as Defendants Barnett Carroll and Cecelia Carroll were aware of (or should have been aware of) the sexual tendencies, deviousness and history of sexual assaults of Wratchford, and taken care not to place [appellant] in danger of being sexually assaulted by him."

He did not allege that Wratchford had committed assaults prior to those alleged by the appellant or that the State had knowledge of any sexual tendencies Wratchford may have had or that he had a history of sexual assaults. There was, in short, no factual allegation as to the basis for the knowledge attributed to the State or that related why the State should have been aware of any deviant tendencies that Wratchford may have had, or even that he, in fact, had such tendencies prior to the alleged incidents that occurred with the appellant.

On May 23, 2003, the State filed a motion to dismiss the appellant's amended complaint, arguing that it failed to state a claim. The Circuit Court granted the motion and, therefore,

dismissed the negligence claims against the State. His motion for reconsideration of the Circuit Court's judgment having been denied and judgment having been entered against the remaining defendants, the appellant noted this appeal.

## II.

The appellant's claim against the State is, as we have seen, a simple negligence claim. Specifically, the appellant argues that the State had a non-delegable duty, imposed both by statute and the special relationship established by the State's placement of him in foster care and the group home, to protect the appellant from sexual and physical abuse and battery by Mr. Wratchford. The State breached that duty, and that the breach was the proximate cause of the appellant's injuries, he concludes. Conversely, the State argues that the appellant's amended complaint does not allege the facts necessary to show that the State had any duty to the appellant. More specifically, the State rejoins that the amended complaint is "devoid of any factual allegation that the State was negligent in licensing or monitoring Finding Direction and contains no facts to support the allegations regarding Wratchford's alleged history," or that the State failed to follow statutory procedures in placing the appellant with Finding Directions. Furthermore, it submits, "the amended complaint contains no allegation that the State received and failed to act upon any report of abuse allegedly inflicted by Wratchford or anyone else against Appellant or any other resident of Finding Direction prior to the injuries alleged in the Complaint, and there is no allegation that the State failed to respond appropriately once the alleged actions of Wratchford were made known."

Maryland's child welfare services—as relevant to this case, what is termed both foster care and out-of-home placement [2]—are governed by Title 5, Subtitle 5, Part III of the Family Law Article, §§ 5–524 through 5–534. Section 5–501(m) of the

---

**2.** Chapter 539 of the Acts of 1998 indicates that the term "foster care" was replaced throughout portions of the code with the term "out-of-home placement."

Family Law Article defines "out-of-home placement" as "placement of a child into foster care, kinship care, group care, or residential treatment care." Maryland Code (1984, 1999 Repl. Vol.), § 5–501(m) of the Family Law Article. Section 5–526 provides that group homes may be "operated by for-profit or nonprofit charitable corporations," subsection (a)(1), and must comply with State licensing laws as set forth in §§ 5–507 through 5–509 of the Family Law Article. Subsection (a)(2).

Regulations for the State's out-of-home placement program, promulgated by the Secretary of Human Resources, are codified in the Code of Maryland Regulations (COMAR) 07.02.11.01 through 07.02.11.34. Group home placement is one option for providing care for displaced children. COMAR states that the purpose of the State's out-of-home placement program is to provide care for children that have "been abused, abandoned, neglected, or [are] dependent, or . . . [are] at imminent risk of serious harm." COMAR 07.02.11.01A. After a court has determined that "continued residence in the child's home is contrary to the child's welfare" and has "[c]ommitted the child to the custody or guardianship of the local department" (DSS), the department "shall initiate out-of-home placement for [the] child." COMAR 07.02.11.04. "In order of preference, a child shall be placed with a relative caregiver, in a foster home, or in a group care setting." COMAR 07.02.11.11A. COMAR also requires that "[a]ny residential treatment facility used by the local department shall meet the requirements for licensure for the facilities established in COMAR 01.04.04 . . ." [3] COMAR 07.02.11.11F. The regulations state that local DSS caseworkers are to have regular contact with children in the out-of-home placement program. COMAR 07.02.11.17A. For children placed in group homes, a "caseworker shall have a face-to-face interview with the child within 1 week of placement, and subsequently at least once a month . . . ." COMAR 07.02.11.17B(1).

---

**3.** Effective June 30, 2005, subtitle 01.04.04 was revised and recodified as COMAR 14.31.05. We shall refer to the regulations in effect at the time of the complaint.

### III.

■ In *Scott v. Jenkins,* 345 Md. 21, 690 A.2d 1000 (1997), Judge Karwacki, writing for the Court, addressed the requisites of a sufficient pleading in a negligence action:

> "In the context of a negligence action, we have previously held that a sufficient pleading must 'allege, with certainty and definiteness, facts and circumstances sufficient to set forth (a) a *duty* owed by the defendant to the plaintiff, (b) a *breach* of that duty and (c) injury *proximately* resulting from that breach.' *Read Drug and Chemical Co. v. Colwill Constr. Co.,* 250 Md. 406, 412, 243 A.2d 548, 553 (1968) (emphasis in original)."

*Id.* at 28, 690 A.2d at 1003.[4] *See also Horridge v. St. Mary's County Dep't of Social Services,* 382 Md. 170, 182, 854 A.2d 1232, 1238 (2004) ("Merely stating that a duty existed, or that it was breached, or that the breach caused the injury does not suffice . . . .").

When reviewing the propriety of the dismissal of a complaint, therefore, we have held that the court must assume the truth of all well-pled factual allegations in the complaint, as well as any reasonable inferences that may be drawn from those allegations. We recently elucidated:

> "As we made clear in *Afamefune ex rel. Afamefune v. Suburban Hosp., Inc.,* 385 Md. 677, 683 n. 4, 870 A.2d 592, 595 n. 4 (2005),

---

**4.** *See also Jackson v. Pennsylvania R.R. Co.,* 176 Md. 1, 5, 3 A.2d 719, 721 (1939) (and cases cited therein):

> "In order for a plaintiff to have a right of action in negligence against a defendant there must exist a duty which is owed by the defendant to the plaintiff to observe that care which the law prescribes in the given circumstances, a *breach* by the defendant of that duty, *damages* and *injury* suffered by the plaintiff as the demonstrable effect of the breach of duty. Negligence is, therefore, the absence of care according to the circumstances. *So, an action for negligence involves the certain and definite allegation of the circumstances, and the failure of the defendant to exercise the care which the law required according to these circumstances. If the allegations should be insufficient to show a duty breached which was the efficient cause of the injury, the declaration is bad on demurrer.*" (Emphasis added.)

'A motion to dismiss for failure to state a claim tests the sufficiency of the pleadings. Md. Rule 2–322(b)(2); *see Converge Services Group, LLC v. Curran,* 383 Md. 462, 475, 860 A.2d 871, 878–79 (2004) ("consideration of the universe of 'facts' pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any"); Paul V. Niemeyer & Linda M. Schuett, *Maryland Rules Commentary,* 206 (3d ed. 2003) ("[t]he object of the motion is to argue that as a matter of law relief cannot be granted on the facts alleged").'

Thus, when reviewing the grant of such a motion, a court 'must assume the truth of all well-pled facts in the complaint as well as the reasonable inferences that may be drawn from those relevant and material facts.' *Porterfield v. Mascari II, Inc.,* 374 Md. 402, 414, 823 A.2d 590, 597 (2003) (indicating that [ ] we accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party). *See Benson v. State,* 389 Md. 615, 626, 887 A.2d 525, 531 (2005); *Bobo v. State,* 346 Md. 706, 707–708, 697 A.2d 1371, 1372–1373 (1997) .... Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff. *Allied Invest. Corp. v. Jasen,* 354 Md. [547,] 555, 731 A.2d [957,] 961 [(1999)]; *Bobo v. State,* 346 Md. at 709, 697 A.2d at 1373; *Morris v. Osmose Wood Preserving,* 340 Md. 519, 531, 667 A.2d 624, 630 (1995). 'On appeal, a reviewing court must determine whether the trial court was legally correct, examining solely the sufficiency of the pleading.' *Benson v. State,* 389 Md. at 626, 887 A.2d at 531."

*Ricketts v. Ricketts,* 393 Md. 479, 491–92, 903 A.2d 857, 864–65 (2006).

■ It is not enough that the plaintiff's allegations and the reasonable inferences from them are consistent and supporting, however. A trial court's dismissal of a complaint will be affirmed if that complaint nevertheless fails to state a claim. As this Court opined in *Patton v. USA Rugby,* 381 Md. 627,

635, 851 A.2d 566, 570 (2004) (*quoting Valentine v. On Target, Inc.,* 353 Md. 544, 548–49, 727 A.2d 947, 949 (1999) (citations omitted)):

> " 'The granting of a motion to dismiss is proper when, even if the facts and allegations as set forth in the complaint were proven to be true, the complaint would nevertheless fail to state a claim upon which relief could be granted .... [I]t will be affirmed if the record reveals any legally sound reason for the decision.' "

 A valid negligence claim, we reiterate, must allege: (1) that the defendant had a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the defendant's breach of duty proximately caused the loss or injury. *Rhaney v. Univ. of Maryland Eastern Shore,* 388 Md. 585, 596, 880 A.2d 357, 363–64 (2005); *Doe v. Pharmacia & Upjohn Co., Inc.,* 388 Md. 407, 414, 879 A.2d 1088, 1092 (2005); *Dehn v. Edgecombe,* 384 Md. 606, 619, 865 A.2d 603, 611 (2005); *Horridge,* 382 Md. at 182, 854 A.2d at 1238; *Patton,* 381 Md. at 635–36, 851 A.2d at 570. In *West Virginia Cent. & P. Ry. Co. v. Fuller,* 96 Md. 652, 54 A. 669 (1903), this Court expressed why the element of duty is key to negligence claims:

> "[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury.... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty."

96 Md. at 666, 54 A. at 671–72. *See Doe,* 388 Md. at 414–15, 879 A.2d at 1092; *Patton,* 381 Md. at 636, 851 A.2d at 570–71;

*Bobo,* 346 Md. at 714, 697 A.2d at 1375; *Ashburn v. Anne Arundel County,* 306 Md. 617, 626–27, 510 A.2d 1078, 1083 (1986). Thus, when analyzing a negligence action it is customary to begin with whether a legally cognizable duty exists. *Doe,* 388 Md. at 414, 879 A.2d at 1092; *Patton,* 381 Md. at 636, 851 A.2d at 571.

■ Whether a legal duty exists is a question of law, to be decided by the court. *Doe,* 388 Md. at 414, 879 A.2d at 1092; *Dehn,* 384 Md. at 619–20, 865 A.2d at 611; *Patton,* 381 Md. at 636, 851 A.2d at 570; *Remsburg v. Montgomery,* 376 Md. 568, 581, 831 A.2d 18, 25 (2003); *Bobo,* 346 Md. at 716, 697 A.2d at 1376 ("The existence of a duty is a matter of law to be determined by the court and, therefore, is an appropriate issue to be disposed of on motion for dismissal.").

■ We have held that duty is " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *See Doe,* 388 Md. at 415, 879 A.2d at 1092 (*quoting Dehn,* 384 Md. at 619, 865 A.2d at 611 (*quoting* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 53 (5th ed. 1984))); *Horridge,* 382 Md. at 182, 854 A.2d at 1239; *Patton,* 381 Md. at 636–37, 851 A.2d at 571. Whether a duty exists depends upon whether one party is entitled to the protection of, or is under an obligation to, the other party. *Doe,* 388 Md. at 415, 879 A.2d at 1093. Thus, this Court stated in *Rosenblatt v. Exxon Co.,* 335 Md. 58, 77, 642 A.2d 180, 189 (1994), that "ultimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." The balancing of policy considerations to determine whether a duty exists involves consideration of a number of factors:

> " 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's

conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.' "

*Ashburn*, 306 Md. at 627, 510 A.2d at 1083 (*quoting Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976)). *See Doe*, 388 Md. at 416, 879 A.2d at 1093; *Horridge*, 382 Md. at 183, 854 A.2d at 1239; *Patton*, 381 Md. at 637, 851 A.2d at 571.

In *Patton*, Judge Harrell, writing for the Court, explicated the importance of the "foreseeability of harm" factor:

"Where the failure to exercise due care creates risks of personal injury, 'the principal determinant of duty becomes foreseeability.' *Jacques v. First Nat'l Bank of Maryland*, 307 Md. 527, 535, 515 A.2d 756, 760 (1986) (citations omitted). The foreseeability test 'is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm.' *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 348, 658 A.2d 675, 678 (1995) (quoting *Henley v. Prince George's County*, 305 Md. 320, 333, 503 A.2d 1333, 1340 (1986)). In determining whether a duty exists, 'it is important to consider the policy reasons supporting a cause of action in negligence. The purpose is to discourage or encourage specific types of behavior by one party to the benefit of another party.' *Valentine*, 353 Md. at 550, 727 A.2d at 950. 'While foreseeability is often considered among the most important of these factors, its existence alone does not suffice to establish a duty under Maryland law.' *Remsburg*, 376 Md. at 583, 831 A.2d at 26. As we clarified in *Ashburn*:

'[t]he fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists

either between the actor and the third person or between the actor and the person injured.'

*Ashburn,* 306 Md. at 628, 510 A.2d at 1083 (citations omitted)."

*Patton,* 381 Md. at 637–38, 851 A.2d at 571–72.

### III.

The appellant asserts that "the State had a duty to protect Appellant from the criminal acts of his attacker because of the duty imposed by statute and because of the special relationship between the Appellant and Appellee." The State does not agree. With regard to the statutory duty argument, it contends that "[i]n placing Appellant at Finding Direction, the State was merely executing its statutory responsibility to provide an out-of-home placement for Appellant in a home that was operating in compliance with applicable licensing laws, and that was otherwise capable of providing appropriate care to Appellant." Moreover, the State denies that a special relationship arose, under the specific circumstances of the case *sub judice,* out of the interaction between the appellant and the State.

This Court discussing the "public duty doctrine," has stated: "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.'" *Muthukumarana v. Montgomery County,* 370 Md. 447, 486, 805 A.2d 372, 395 (2002) (*quoting* Dan B. Dobbs, *The Law of Torts* § 271 (2000) (footnote omitted)). An example, is the "'duty' owed by the police by virtue of their positions as officers is a duty to protect the public." *Ashburn,* 306 Md. at 628, 510 A.2d at 1084; *Muthukumarana,* 370 Md. at 486, 805 A.2d at 395. In *Muthukumarana,* we explained: "Pursuant to the doctrine, therefore, police officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence action requires, to those individuals." 370 Md. at 486–87, 805 A.2d at 395. It is clear, however, that there are limitations to the

public duty doctrine, "[s]pecifically, it 'has no application when the court concludes that a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large.'" *Id.* at 487, 805 A.2d at 396 (*quoting* Dobbs, *supra,* § 271 (emphasis added)).

A "special relationship" may arise between two parties, constituting an exception to the public duty doctrine. *Ashburn,* 306 Md. at 628, 510 A.2d at 1083. Thus, in the context of a police officer, if it can "be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection," then a special relationship exists which satisfies the duty element of a negligence claim. *Ashburn,* 306 Md. at 631, 510 A.2d at 1085 (citations omitted); *Muthukumarana,* 370 Md. at 488, 805 A.2d at 396.

At the hearing on the appellant's motion for reconsideration, the trial judge ruled:

"In this court's view, licensing is a governmental function and creates no legal duty. And absence [sic] evidence to the contrary, the duties to license or to supervise the licensed foster care program after licensing is a duty owed to the public generally, the breach of which is not actionable on behalf of a private person who suffers damage.

"Because no such duty exists against a private party, there is no duty against a private party and, thus, no actionable negligence. So, I will deny Plaintiff's motion to reconsider."

The appellant challenges the trial judge's application of the public duty doctrine in this case.

The trial court based its decision on *Willow Tree Learning Center, Inc. v. Prince George's County,* 85 Md.App. 508, 584 A.2d 157 (1991). In *Willow Tree,* a child was fatally injured while using playground equipment at a day-care center. The child's parents brought an action against the day-care center, which, in turn, sought contribution or indemnification from Prince George's County and its inspector. The question on

appeal was whether there was a statutory duty on the part of the County to discover, and report, the allegedly unsafe playground equipment from which the child's injury resulted. The pertinent COMAR regulations and County ordinances provided that the playground was to be maintained "free from hazards" and "free from conditions likely to endanger the life or health of children." *Willow Tree*, 85 Md.App. at 514, 584 A.2d at 160. The intermediate appellate court held "that the State or the County does not owe any individual duty of care merely by the enactment of a general ordinance requiring safety inspections, nor by the fact that it undertook inspections for safety violations. The duty created by the statute and ordinance was one owed to the public generally." *Id.* at 515, 584 A.2d at 160–61. The court concluded that "[t]here is a complete lack of any intention on the part of the Legislature which would indicate that it was creating a duty to individual members of the public, and we will not create one." *Id.* at 515–16, 584 A.2d at 161.

The appellants in *Willow Tree* argued, in addition, that a special relationship existed between them and the County, an argument that the intermediate appellate court also rejected. It reasoned: (1) the County did not affirmatively and specifically act to protect individual children, but rather, children and others generally, (2) the ordinance there at issue did not contain requirements for mandatory acts for the specific protection of a particular class of persons, and (3) by adopting an inspection program, the County was mandatorily complying with relevant statutory law, not voluntarily assuming a special relationship. *Id.* at 518–19, 584 A.2d at 162–63.

The appellant distinguishes *Willow Tree* from the case at bar on the basis that, unlike this case, where the State removed the child from parental custody and placed him in the custody of a foster home, in *Willow Tree,* "neither the State of Maryland nor a State agency was the actor who placed the child at the scene of the injury." It is this affirmative act on the part of the State in this case which renders the "public duty doctrine" argument inapplicable, the appellant concludes. We do not agree. The State's removal of the appellant from

parental care was done pursuant to a statutory mandate. As we shall explain *infra*, that act is not the kind of "affirmative act" that gives rise to a special relationship that would impose a duty on the State for the benefit of the appellant.

### A. Statutory Duty

The appellant asserts that the State has a statutory duty, imposed by Maryland Code (1984, 1999 Repl. Vol.), § 5–526(c) of the Family Law Article, not to place children in an abusive group home. Section 5–526(c) provides, in pertinent part:

> "(c) *Compliance with licensing laws.*—The Department, or the Department's designee, may not place a child in a residential group home or other facility that is not operating in compliance with applicable State licensing laws."

Relying on this statute, the appellant contends that "[t]he Legislature, therefore, has created a duty flowing to children specifically identified by virtue of prior, affirmative action taken to protect them by removing them from their former, unsuitable custodial circumstance." Furthermore, he submits, "placement of a child in a facility that is not operating in accordance with the requirements of the law, therefore, is in and of itself a breach of statutory duty."

We stated in *Remsburg v. Montgomery*, 376 Md. 568, 831 A.2d 18 (2003), that:

> "Evidence of negligence may be established by the breach of a statutory duty 'when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent.' *Erie Ins. Co. v. Chops*, 322 Md. 79, 84, 585 A.2d 232, 234 (1991) (citing *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 362, 517 A.2d 1122[, 1132] (1986)); *see also Geo. Byers Sons, Inc. v. East Europe Import Export, Inc.*, 463 F.Supp. 135, 138 (D.Md.1979) ('To use a statutory duty as a foundation for a negligence claim, the plaintiff must show that it was within the class of persons the legislation was intended to protect and that the alleged injury was the type of harm which the statute was intended to prevent'). Furthermore,

the statute must 'set forth mandatory acts clearly for the protection of a *particular class* of persons rather than the public as a whole.' *Ashburn,* 306 Md. at 635, 510 A.2d at 1087 (quoting *Morgan v. District of Columbia,* 468 A.2d 1306, 1314 (D.C.1983)) (citations omitted)."

*Id.* at 584, 831 A.2d at 27 (emphasis in original).

The policy of the State of Maryland with respect to child welfare is enunciated in Maryland Code (1984, 1999 Repl. Vol.), § 5–502 of the Family Law Article, which provides:

"(a) *Declarations.*—The General Assembly declares that:

"(1) minor children are not capable of protecting themselves; and

"(2) when a parent has relinquished the care of the parent's minor child to others, there is a possibility of certain risks to the child that require compensating measures.

"(b) *Policy.—It is the policy of this State:*

"(1) *to protect minor children whose care has been relinquished to others by the children's parent;*

"(2) to resolve doubts in favor of the child when there is a conflict between the interests of a minor child and the interests of an adult; and

"(3) to encourage the development of day care services for minor children in a safe, healthy, and homelike environment." (Emphasis added.)

One of those policies is to protect minor children in its care. The record in this case does not show, or even suggest, that the State has done anything in violation of this policy. To be sure, the State placed the appellant at Finding Direction, Inc., a duly licensed group home. §§ 5–507 through 5–509 of the Family Law Article; COMAR 01.04.04. But the appellant does not allege in his amended complaint that the State was negligent in licensing or monitoring Finding Direction, Inc. And there were no allegations that, when the appellant was placed, Finding Direction, Inc., was not then operating in compliance with applicable State licensing laws. Thus, there is no allegation, never mind evidence, showing that the State

violated § 5–526(c) by placing the appellant with Finding Direction, Inc. In the absence of such an allegation, the appellant's amended complaint is insufficient to plead negligence based upon an alleged statutory duty.

Before proceeding to a discussion of the special relationship prong of the appellant's argument, it is important to distinguish *Horridge v. Department of Social Services*, 382 Md. 170, 854 A.2d 1232 (2004). *Horridge* was a negligence action that had been dismissed for failure to state a claim. The case arose out of the abuse, and eventual murder, of a young child. The father of the child, who resided in Texas, alleged that "he made eight reports to the St. Mary's County DSS of physical abuse being inflicted on his nineteen-month-old son Collin by Collin's mother or her boyfriend . . . ." *Id.* at 175, 854 A.2d at 1234. DSS was largely unresponsive to both the father's reports and to a neighbor's independent report. DSS employees made visits to the home but decided against taking any action, relying instead on the mother's positive statements concerning the well-being of the child. Social workers from DSS treated the father's complaints as those of an estranged, custody-deprived father, and told him not to make any further reports. They made no further inspections based upon the father's last report. Tragically, two to three months after the father began making reports to DSS, the child was beaten to death.

The appellant contends that the *Horridge* Court determined that there was a "special relationship" between the State and the aggrieved party in that case, which created a duty applicable here. He substantially relies on that case to argue that "several criteria have been identified to determine whether or not a 'special relationship' exists." This argument, however, is somewhat misplaced. Horridge pled two counts of negligence against DSS, one based upon a statutory duty and the other based upon a duty arising out of a special relationship. The Court addressed only the issue of statutory duty. *Id.* at 183, 854 A.2d at 1239 ("[W]e need deal only with the statutory context pled in Count I.").

In relation to that statutory duty, the relevant statutes in *Horridge* were §§ 5–701 through 5–714 of the Family Law Article, rather than § 5–526(c), as in this case. Those sections of the Family Law Article require anyone who may have reason to believe that a child has been subjected to abuse or neglect to notify the DSS or a law enforcement agency, *see* §§ 5–704(c) and 5–705(d), as a result of and in response to which DSS must respond within 24 hours. Section 5–706(b). This latter section and the corresponding COMAR sections, the Court in *Horridge* concluded, imposed a duty on DSS:

> "The duties imposed on DSS by FL § 5–706 and the implementing regulations of the Department of Human Resources are far more specific and focused. They require a prompt investigation of *each* reported incident of child abuse. The duty to act is mandatory; the steps to be taken are clearly delineated; and, most important, the statute makes clear in several places that the sole and specific objective of the requirement is the protection of a specific class of children—those identified in or identifiable from specific reports made to DSS and those also found in the home or in the care or custody of the alleged abuser. This is not an obligation that runs to everyone in general and no one in particular. *It runs to an identified or identifiable child or discrete group of children.*"

*Horridge*, 382 Md. at 189–90, 854 A.2d at 1243 (some emphasis added). The statutes with which the *Horridge* Court was concerned were intended to protect a specific class of children, by requiring a mandatory response by DSS to each reported incident of child abuse. That obligation was owed, therefore, to "a specific class of children, identified or identifiable before the fact from statutorily mandated reports, from a specific kind of harm likely to occur if the statutory duty is ignored. DSS is given not just a specific duty to act in response to such a report but ample and detailed authority to do so." *Id.* at 192, 854 A.2d at 1244. The Court concluded that:

> "The legislative policy of preventing future harm to children already reported to have been abused is so abundantly clear as to be beyond cavil, and, given the statutory man-

date to act and the general waiver of tort immunity when State employees fail to act in a reasonable way and harm ensues, we can see no great burden or consequence to regarding this existing statutory duty as a civil one from which tort liability may arise. We cannot conceive that the Legislature intended, when a child is killed or injured, at least in part because DSS fails to perform the duties clearly cast upon it to make a site visit within 24 hours and a thorough investigation, for the only sanction to be the placement of a reprimand in some social worker's personnel file. The Legislature meant for DSS and its social workers to act immediately and aggressively when specific reports of abuse or neglect are made, and the best way to assure that is done is to find that they *do* have a special relationship with specific children identified in or, upon reasonable effort, identifiable from, facially reliable reports of abuse or neglect and, subject to the State Tort Claims Act, to make them liable if harm occurs because they fail in their mandated duty."

*Horridge,* 382 Md. at 193, 854 A.2d at 1245.

In *Horridge,* there was no issue raised as to the sufficiency of the pleadings, the State simply having failed satisfactorily to comply with the specific mandates, with the discharge of which one of its agencies was charged. In the case *sub judice,* on the contrary, there are no well-pled factual allegations that the State failed to comply with a specific statutory requirement. The State placed the appellant in the care of Finding Direction, Inc., a duly licensed group home, to be sure. While that was properly alleged, it was not alleged that the State had not properly licensed or supervised Finding Direction, Inc., or that Finding Direction, Inc., was, in any way, in violation of the requirements of its operating license. Furthermore, once Finding Direction, Inc., was apprized that the appellant had reported that he had been sexually abused and battered, it notified the State, as it was required to do, and the State acted immediately to address the situation. Thus, unlike the situation in *Horridge,* where the pleadings alleged a failure on the part of the State to respond as statutorily

required, the complaint here contained no such sufficient allegation of the State's dereliction in failing to respond, once it was notified of the alleged incident of abuse.

## B. Special Relationships

Regardless of the distinction between *Horridge*[5] and this case, it is evident that the relationship of one party to another may give rise to a duty under certain circumstances. In rationalizing these "special relationships," the Court has adopted the reasoning of several sections, reflective of our common law, of the *Restatement (Second) of Torts*,[6] or reasoned from the affirmative action of one party, on the basis of which the other party relies to his or her detriment.[7] These relationships are often separate and distinct, yet they both involve the same duty and responsibility, however the resulting relationship is forged or develops. As the appellant sees it, the State did an affirmative act when it removed him from his mother's care and his parents' custody, thus establishing a special relationship with, and a concomitant duty to, him, as one of the children in the State's care. This use of "affirmative act," however, blurs the distinction between the application of the common law duty and the reliance duty. We shall

---

**5.** Citing *Jensen v. Anderson County DSS*, 304 S.C. 195, 403 S.E.2d 615 (1991), the appellant states that the *Horridge* Court "recently utilized a six-part analytical tool to determine whether a statutory or regulatory regime may create a special duty, and therefore a special relationship, between the State and the victim." On the contrary, we determined, in *Horridge* that "[i]t is not necessary to adopt precisely the six-part test enunciated by the South Carolina court in *Jensen,* although the elements of that test are analytically relevant and consistent with the considerations we noted in *Ashburn v. Anne Arundel County, supra,* 306 Md. 617, 627, 510 A.2d 1078, 1083, and *Remsburg v. Montgomery, supra,* 376 Md. 568, 583, 831 A.2d 18, 26." *Horridge,* 382 Md. at 192, 854 A.2d at 1244. Thus, in this case, we will not address appellant's application of the *Jensen* six-part test.

**6.** *See Lamb v. Hopkins,* 303 Md. 236, 245, 492 A.2d 1297, 1302 (1985).

**7.** We have also referred to a special duty or special relationship being created by statute. *Horridge,* 382 Md. at 193, 854 A.2d at 1245. This creates some confusion in the utilization of the term "special relationship."

analyze the duty that arises out of special relationships in both contexts.

## Common Law

*Restatement (Second) of Torts* discusses special relationships, and the duties that arise therefrom, in several pertinent sections. *Restatement (Second) of Torts* §§ 314A, 315, 319–20 (1965).[8] Judge Harrell, writing for the Court, in *Remsburg v. Montgomery*, 376 Md. 568, 831 A.2d 18 (2003), cogently ana-

---

**8.** Section 314A states in pertinent part:

"(1) A common carrier is under a duty to its passengers to take reasonable action

(a) to protect them against unreasonable risk of physical harm, and

(b) to give them first aid after it knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.

\* \* \*

(4) One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to the other."

Section 315 states:

"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection."

Section 319 states:

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Section 320 states:

"One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal power of self-protection or to subject him to association with persons likely to harm him, is under a duty to exercise reasonable care so to control the conduct of third persons as to prevent them from intentionally harming the other or so conducting themselves as to create an unreasonable risk of harm to him, if the actor

(a) knows or has reason to know that he has the ability to control the conduct of the third persons, and

(b) knows or should know of the necessity and opportunity for exercising such control."

*Restatement (Second) of Torts* §§ 314A, 315, 319–20 (1965).

lyzed *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985), where the Court discussed the Restatement's application to negligence liability for the actions of third persons:

"In *Lamb* . . ., we discussed in detail the inherent nature of the relationship between parties which could give rise to liability for the actions of a third party. In *Lamb,* we found that the *Restatement (Second) of Torts* was applicable to analysis of negligence liability for third party actions. Regarding the Restatement, we observed that:

[s]ection 315 is a special application of the general rule set forth in § 314. Section 314 states that '[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action.' In turn, § 315 articulates the general rule that:

[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

(b) a special relation exists between the actor and the other which gives to the other a right to protection.

303 Md. at 242, 492 A.2d at 1300. In reviewing our history of both citation and reference to § 315, we found that our decision in *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976), 'suggests that § 315, which reflects the common law of this State, outlines the appropriate analytical framework for determining whether an actor has a duty to control a third person.' *Lamb,* 303 Md. at 245, 492 A.2d at 1302.

We continued by examining in further detail the class of special relationships giving rise to a duty to control a third person's conduct based on the *relationship between the third person and the actor.* We found such relations were described in Restatement § § 316–19, specifically:

[s]ection 316 provides that a parent has a duty to control the conduct of his minor child; § 317 establishes a mas-

ter's duty to control the conduct of his servant; § 318 sets forth the duty of a possessor of land or chattels to control the conduct of a licensee; and § 319 deals with the duty of those in charge of persons having dangerous propensities.

*Lamb,* 303 Md. at 243, 492 A.2d at 1300–01; *see also Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 150, 642 A.2d 219, 226 (1994) ('[a]lthough section 315 of the Restatement states the general rule, section 319 addresses a particular exception to that general rule'). We expressly adopted as Maryland common law § 319, which provides: '[o]ne who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.' *Lamb,* 303 Md. at 243, 492 A.2d at 1301. Delineating the boundaries of § 319, we stated that:

[t]he operative words of this section, such as 'takes charge' and 'control,' are obviously vague, and the Restatement makes no formal attempt to define them. The comment to § 319, however, indicates that the rule stated in that section applies to two situations. First, § 319 applies to those situations where the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. Second, § 319 applies to those situations where the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

Illustrations appended to § 319, which concern the negligent release of an infectious patient from a private hospital for contagious diseases and the escape of a homicidal maniac patient through the negligence of guards employed by a private sanitarium for the insane, provide further guidance regarding the scope of § 319. Because there are degrees of being 'in charge' and having 'control,' these illustrations are obviously not by way of limitation.

See *McIntosh v. Milano,* 168 N.J.Super. 466, 483 n. 11, 403 A.2d 500, 508–09 n. 11 (1979). These illustrations suggest, however, that § 319 has peculiar application to *custodial situations.* See Prosser and Keeton, supra, § 56 & n. 16, at 383 (indicating that the relationships discussed in § 319 'are custodial by nature').

303 Md. at 243–44, 492 A.2d at 1301 *(emphasis added)."*

*Remsburg,* 376 Md. at 590–92, 831 A.2d at 31–32. *See Patton,* 381 Md. at 639–40, 851 A.2d at 573; *Corinaldi v. Columbia Courtyard, Inc.,* 162 Md.App. 207, 221–20, 873 A.2d 483, 490 (2005).

The appellant directs our attention to *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), for the proposition that the appellant was in the "custody" of the State when he was in the group home. In *DeShaney,* a civil rights action (under 42 U.S.C. § 1983), was brought by the mother of a child who had been beaten by his father, against social workers who had received complaints that the child was being abused by his father, but failed to remove him from his father's custody, and their employer, the DSS. The Supreme Court held that, after receiving the complaint, the State had no constitutional duty to protect the child from his father. 489 U.S. at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 263. Noting that "the harms [the child] suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor," *DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006, 103 L.Ed.2d at 262, it explained:

"[i]n the *substantive due process analysis,* it is the State's affirmative act of restraining the individual's freedom to act on his own behalf-through incarceration, institutionalization, or other similar restraint of personal liberty-which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means."

*DeShaney*, 489 U.S. at 200, 109 S.Ct. at 1006, 103 L.Ed.2d at 262 (emphasis added); *see also Youngberg v. Romeo*, 457 U.S. 307, 317, 102 S.Ct. 2452, 2459, 73 L.Ed.2d 28 (1982) (duty to provide certain services and care to institutionalized person; but, the State "has considerable discretion in determining the nature and scope of its responsibilities"); *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251, 259 (1976) (duty to provide medical needs to inmate).

To be sure, *DeShaney* involved a factual situation similar to the case *sub judice* and even more factually similar to *Horridge*. It was decided, however, in the context of constitutional due process. Although the Court mentioned the State's duty in that case in the context of negligence claims, stating, "[i]t may well be that, by voluntarily undertaking to protect [the child] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger[,]" *id.* at 201–02, 109 S.Ct. at 1006, it did so only in dicta. The Court also observed, expressly declining to opine on its validity:

"Had the State by the affirmative exercise of its power removed [the child] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeals have held, by analogy to *Estelle* and *Youngberg*, that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents. *See Doe v. New York City Dept. of Social Services*, 649 F.2d 134, 141–142 (C.A.2 1981), *after remand*, 709 F.2d 782, *cert. denied sub nom, Catholic Home Bureau v. Doe*, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 794–797 (C.A.11 1987) (en banc), *cert. pending [cert. denied] Ledbetter v. Taylor*, No. 87–521[, 489 U.S. 1065, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989)]. *We express no view on the validity of*

*this analogy, however, as it is not before us in the present case."*

*DeShaney,* 489 U.S. at 201 n. 9, 109 S.Ct. at 1006 n. 9, 103 L.Ed.2d at 263 n. 9 (emphasis added). Therefore, the Court's holding is only tangentially relevant to the case at hand.

As stated *supra,* the appellant failed to allege facts sufficient to establish that, under the facts and circumstances of this case, the State violated an affirmative duty of care, statutorily created by the Legislature, the benefits of which redounded to the appellant. Additionally, we reiterate that, as discussed *infra,* the appellant has not satisfactorily alleged any facts to show that the State took an affirmative act on its own part that would create a common law special relationship from which a duty would arise.

 Generally unless there is a special relationship, "[t]here is no duty to control the conduct of a third person as to prevent him [or her] from causing physical harm to another. . . ." *Restatement (Second) of Torts* § 315 (1965). There are two circumstances in which a special relationship giving rise to a duty on the part of the State could have been alleged to exist in the case *sub judice:* (1) the State had control of Wratchford and knowledge of some propensity of his to do harm to others (§ 319) and (2) the State, having custody of the appellant and having placed him in foster care, owed the appellant a duty to exercise reasonable care in protecting him from other persons under the State's control, as to whom it knew, or had reason to know, could, and likely would, harm him. § 319 (a party must "know or have reason to know" that a third person is likely to cause harm to another); § 320 (it is necessary for a party to exercise control over a third person to prevent that person from harming another intentionally and that the State had knowledge of the necessity to control such third persons). Any duty, if in fact one exists, is then a duty of reasonable care under the circumstances. *Albeit* in the context of a statutory duty, the prerequisite knowledge did exist in *Horridge* and was pled in the complaint in that case. There was, however, no sufficient factual allegation of such

knowledge in the amended complaint in the instant case.[9]

In his reply brief, the appellant argues that he could not provide any additional factual specificity. He offered two reasons: "First, what the State knew about Wratchford is a fact solely within the State's control.[10] Second, the docu-

---

9. The Public Justice Center, a non-profit civil rights and anti-poverty legal services organization, filed an Amicus Curiae brief in support of the appellant's position. It points to several cases from foreign jurisdictions that it argues support the proposition that "[c]ourts have recognized that the special relationships between government entities and children under their custody in the child welfare system gives rise to a duty to protect." *P.G. v. State*, 4 P.3d 326, 331–332 (Alaska 2000); *Ronald S. v. County of San Diego*, 16 Cal.App.4th 887, 895–899, 20 Cal.Rptr.2d 418 (1993); *Mark G. v. Sabol*, 677 N.Y.S.2d 292, 301, 247 A.D.2d 15, 30–31 (1998). These cases are distinguishable from the case *sub judice*. None of them addressed the situation where the State placed a child with an independently licensed group home, as to which there were no allegations of licensing impropriety.

The *P.G.* court found a special relationship between the State and prospective foster parents. 4 P.3d at 331–332. The court concluded that the State had a duty to inform the prospective foster parents of a foster child's history so that they could make an informed decision as to whether to adopt the child. *Id.* The *Ronald S.* court held that a special relationship existed between the County and a foster child with respect to the child's foster care placement. 16 Cal.App.4th at 895, 20 Cal. Rptr.2d 418. That relationship, arising from the child's dependency, *i.e.*, he was entirely in the County's control, *id.*, imposed a duty on the County to investigate the qualifications of the proposed foster parents. *Id.* Finally, the *Mark G.* court only assumed, for argument's sake, that *DeShaney, supra*, signaled that a special relationship is created between the State and a child when the child is removed from his home and placed into foster care. *Mark G.*, 677 N.Y.S.2d at 300, 247 A.D.2d at 21. The court did not further elaborate on this, it only found that whether a claim of a special relationship or a duty owed by the State existed was a question for the jury to decide. *Id.* at 301, 247 A.D.2d at 30, 677 N.Y.S.2d 292. Under Maryland law, the existence of a duty is a matter of law to be determined by the court. *Doe*, 388 Md. at 414, 879 A.2d at 1092; *Dehn*, 384 Md. at 619–620, 865 A.2d at 611; *Patton*, 381 Md. at 636, 851 A.2d at 570; *Remsburg*, 376 Md. at 581, 831 A.2d at 25; *Bobo*, 346 Md. at 716, 697 A.2d at 1376.

10. The appellant contends that the statutory scheme governing child welfare services—outlined in §§ 5–524 through 5–534 of the Family Law Article and the pertinent provisions of COMAR—establish procedures that envision that the State will have relevant information regarding a child in its custody or care. Relevant information with respect to out-of-home placements and, in particular, group home placements, would include, as pertinent to this case, information about any assaul-

ments, if any, that would disclose what the State knew about Wratchford are confidential and, therefore, [the appellant] was unable to ascertain that information prior to discovery." [11]

■ The appellant argues that the State had, or should have had, knowledge of Wratchford's alleged history of committing abuse, if there was any such history, by virtue of the documents it was required to provide the group home prior to Wratchford's admission to the group home, i.e., his social history or predisposition report and any psychological or psychiatric reports, COMAR 01.04.04.23. In addition, it should have had the reports of the social workers who met

---

tive or abusive conduct in which Wratchford may have engaged. Specifically, COMAR 01.04.04.23 provides, in relevant part, that a group home:

"(4) Shall, except for emergency placements, admit a child only after the licensee has received at least:

"(a) A social history or predisposition report;

"(b) An educational history;

"(c) A health history that is not older than 6 months;

\* \* \*

"(e) If required by federal or State law, any psychological, psychiatric, or developmental assessment that is not older than 12 months; . . . ."

Moreover, pursuant to COMAR 07.02.11.17, local DSS caseworkers are required to have regular contact with children in the out-of-home placement program, COMAR 07.02.11.17A, and for children placed in group homes, a "caseworker shall have a face-to-face interview with the child within 1 week of placement, and subsequently at least once a month . . . ." COMAR 07.02.11.17B(1).

11. Maryland Code (1973, 2006 Repl. Vol.), § 3–827 of the Courts and Judicial Proceedings Article, provides: "All court records under [Subtitle Eight. Juvenile Causes—Children in Need of Assistance] pertaining to a child shall be *confidential* and their contents may not be divulged, by subpoena or otherwise, *except by order of the court on good cause shown.*" (Emphasis added); Section 3–8A–27 of the Courts and Judicial Proceedings Article provides that a minor's police records are confidential; Maryland Code (1957, 2003 Repl. Vol.), Article 88A, § 6(a) provides:

"[I]t shall be unlawful for any person or persons to divulge or make known in any manner any information concerning any applicant for or recipient of social services, child welfare services . . . directly or indirectly derived from the records, papers, files, investigations or communications of the State, county or city, or subdivisions or agencies thereof, or acquired in the course of the performance of official duties."

with him as COMAR 07.02.11.17 required them to do. He also cites *Whiteley v. Schoenlein*, 183 Md. 590, 596, 39 A.2d 692, 695 (1944), for the contention that "[t]he rule requiring positiveness of pleading is relaxed so as to permit an allegation on information and belief where the fact is not presumably within the knowledge of plaintiff but is within that of the defendants." 183 Md. at 596, 39 A.2d at 695 (*citing Hendrickson v. Standard Oil Co.*, 126 Md. 577, 588, 95 A. 153, 158 (1915)).

· *Whiteley* was not a negligence case, rather it was a contract case in which the dispute concerned a provision of that contract relating to the division of the profits due the parties to the business venture. 183 Md. at 596, 39 A.2d at 695. Specifically, as relevant here, the Court stated:

> "As to the contention that the complainant nowhere states the basis of his belief that there was a substantial profit and that this is a mere conclusion of the pleader, the bill does allege that the defendants have custody of all the records and have failed to make an accounting. The rule requiring positiveness of pleading is relaxed so as to permit an allegation on information and belief where the fact is not presumably within the knowledge of the plaintiff but is within that of the defendants."

*Id.* It was in this respect, and only in this respect, that the Court relaxed the requirement for positiveness of pleading— where there is an allegation of exclusive custody of records and the relief sought depends on what those records show. The Court relied on *Hendrickson v. Standard Oil Co.*, 126 Md. 577, 95 A. 153, *supra*. That case also did not concern a negligence claim; the issue, nuisance, involved allegations related "to the prospective installation of a large tank, for the storage of inflammable and explosive oils, in immediate proximity to the plaintiff's houses." *Hendrickson*, 126 Md. at 588, 95 A. at 158. We stated that:

> "This would undoubtedly be a nuisance against which the plaintiff would have a clear right to preventive relief. The allegation as to this branch of the case is not in the form of a specific charge, but states only the plaintiff's information

and belief in regard to the purpose of the defendant to locate the storage tank in the position indicated. It is objected that this form of averment is not sufficiently definite; but it is to be observed that the bill was referring in this instance to the defendant's *intention,* and, as said in 16 Cyc. 230, the rule requiring positiveness of pleading 'is relaxed so as to permit an allegation on information and belief where the fact is not presumably within the knowledge of plaintiff, but is within that of defendant.' "

*Hendrickson,* 126 Md. at 588, 95 A. at 158.

These cases, and the allegations they addressed, are distinguishable from the allegations in the case *sub judice.* There is a real difference between the allegations required to plead an accounting and those necessary to plead negligence. The facts in the former situation are often exclusively within the defendant's knowledge and possession, including, most particularly, the thought process critical to the resolution of the issue. Similarly, generally, *intention* is different from a concrete fact that is discoverable by, and during, investigation.

 Different situations and causes of action may require different, varying levels of factual specificity for pleading purposes. We stated in *Read Drug and Chemical Co. v. Colwill Construction Co.,* that:

> "It is obvious that the necessary allegations of fact sufficient to state a cause of action for negligence in a simple factual situation vary from those in more complex factual situations and a form of declaration useful in the former situation may not be sufficient as a guide in preparing a declaration for the more complex case."

250 Md. 406, 413, 243 A.2d 548, 553 (1968). Discussing the pleading standard in negligence actions, the Court quoted, with approval, from Joseph O. Kaiser, *Pleading Negligence in Maryland–Res Ipsa Loquitur as a Rule of Pleading,* 11 Md. L.Rev. 102, 103–04 (1950):

> "Thus, a rather flexible standard is presented to the Maryland practitioner for his use in stating a cause of action for negligence. A survey of the Maryland statutory forms

and the Maryland cases will demonstrate that where the plaintiff's right and the defendant's corresponding duty are simple and easily perceived, a simple factual statement of the defendant's act or omission in breach thereof, coupled with the general characterization of the defendant's act or omission as negligent, will suffice. On the other hand, *the less apparent the plaintiff's right and the defendant's duty, the more likely the pleader will be required to specify the acts or omissions relied upon to constitute the negligent conduct.* Otherwise stated, in simple situations involving an easily recognized breach of duty, a general averment of negligence following a simple statement of the defendant's act or omission will be regarded as an ultimate fact; while *in more complex situations where the breach of duty is not readily apparent, such an averment will be regarded as a mere legal conclusion.*" (Emphasis added.) (Footnote omitted.)

*See Read Drug,* 250 Md. at 413–14, 243 A.2d at 553.

As to the latter category of case—the "more complex situation"—the Court instructed:

"Except in cases involving such simple and specialized situations as the motor vehicle and carrier-passenger cases [respectively *American Express Company v. State for Use of Denowitch,* 132 Md. 72, 103 A. 96 (1918) and *Philadelphia, Baltimore & Washington R.R. Co. v. Allen,* 102 Md. 110, 62 A. 245 (1905)], this Court has consistently held that a declaration must, as stated by Judge Alvey, for the Court, in *Gent v. Cole,* 38 Md. 110, 113 (1873) (quoting in part from an opinion by Mr. Justice Butler in *Rex v. Lynne Regis,* Doug. 159), have sufficient specificity in its allegations to provide '*facts* * * *, "for the purpose of informing the court, whose duty it is to declare the *law* arising upon these facts, and to apprise the opposite party of what is meant to be proved, in order to give him an opportunity to answer or traverse it." ' (Emphasis in original.)"

*Read Drug,* 250 Md. at 414, 243 A.2d at 554. It offered its prior case law as support for its analysis:

"This principal of pleading has been applied in many types of cases. In the landmark case of *State, use of Jeter v. Schwind Quarry Co.*, 97 Md. 696, 55 A. 366 (1903), a declaration was held to be insufficient on demurrer which alleged that the defendant operator of a stone quarry negligently directed the decedent of the plaintiff to extract a charge of blasting powder which had been placed in a hole drilled in a rock; that the plaintiff's decedent was not sufficiently skilled for this type of work, was ignorant of the danger involved and was not warned of the danger by the defendant; that in the execution of the work assigned to him, the plaintiff's decedent was killed due to the negligence of the defendant. The trial court sustained a demurrer to the declaration and the judgment for the defendant for costs was affirmed. This Court held that the declaration was insufficient because it failed to allege specifically enough in what way the defendant violated any duty to the plaintiff's decedent, that is, in what respect the place supplied by the defendant for the plaintiff's decedent to work was not safe; what was the particular danger which was created by the negligence of the defendant; and how the allegedly unsafe condition was connected with and caused the accident.

"In *Livingston v. Stewart & Co., Inc.*, 194 Md. 155, 69 A.2d 900 (1949), the declaration alleged that while the plaintiff was a business invitee in the defendant's department store, a two-wheel bicycle fell on the plaintiff as a result of which the plaintiff was injured through the negligence of the defendant and without any fault of the plaintiff. In the bill of particulars filed by the plaintiff, it was stated that the exact facts of the negligence of the defendant were particularly within the knowledge of the defendant which had sole control of the bicycle. This Court held that the lower court properly sustained the demurrer to the declaration because it 'contains only the argumentative conclusion that plaintiff's injuries were caused by defendant's negligence, but states no acts done or left undone by defendant which constitute negligence or a negligent manner of doing anything.' (194 Md. at 159, 69 A.2d at 901.) Judge Mar-

kell, for the Court, in *Livingston* quoted with approval from *Phelps v. Board of Com'rs of Howard County*, 117 Md. 175, 177, 82 A. 1058, 1059 [(1912)], that ' "the general characterization of an act or omission as negligent, or of a condition as unsafe is not usually a sufficient statement of the supposed ground of liability." ' (194 Md. at 159, 69 A.2d at 901.)"

*Read Drug*, 250 Md. at 414–15, 243 A.2d at 554.

The amended complaint does not address a situation where "the plaintiff's right and the defendant's [corresponding] duty" are "simple and easily perceived," or involve an easily recognized breach of duty. It does not allege "in what way the [State] violated any duty to the [appellant]," *Read Drug*, 250 Md. at 415, 243 A.2d at 554, *citing Jeter*, 97 Md. at 699, 55 A. at 367, or the "acts done or left undone by the [State] which constitute negligence or a negligent manner of doing anything." *Livingston*, 194 Md. at 159, 69 A.2d at 901. Accordingly, the appellant's averments, without more factual specificity as to the relationship between the State and Wratchford, and thus its knowledge of his potential danger to a roommate, constitute simply legal conclusions.

 As we have seen, the appellant argues that the State's removal of the appellant from his mother's care constituted an "affirmative act," which thereby established a special relationship between the State and the appellant. We do not agree. "Affirmative act," as used by the appellant and as applied in this context, is not characteristic of the kind of conduct this Court has found necessary to establish a special relationship.

We considered the nature of the conduct necessary to "forge" a special relationship in *Ashburn v. Anne Arundel County*, 306 Md. 617, 510 A.2d 1078 (1986). There, in the context of a police officer's interaction with the public, characterizing the key element as an "affirmative act," the Court stated, generally:

"A proper plaintiff, however, is not without recourse. If he alleges sufficient facts to show that the defendant policeman created a 'special relationship' with him upon which he

relied, he may maintain his action in negligence. *See Restatement (Second) of Torts* § 315(b). This 'special duty rule,' as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner. *See Scott v. Watson, supra,* 278 Md. at 170–71, 359 A.2d at 555; *Penna R.R. Co. v. Yingling,* 148 Md. 169, 129 A. 36 (1925). In order for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer *affirmatively acted to protect the specific victim or a specific group of individuals like the victim,* thereby inducing the victim's specific reliance upon the police protection."

*Ashburn,* 306 Md. at 630–31, 510 A.2d at 1085 (emphasis added) (footnote omitted); *Williams v. Mayor and City Council of Baltimore,* 359 Md. 101, 144, 753 A.2d 41, 64 (2000).

In *Ashburn,* a police officer noticed an intoxicated man sitting behind the wheel of a car parked, with its engine left running, outside of a 7–11 convenience store. Rather than arrest the man, as he obviously could have done, the officer told him to pull his vehicle to the side of the store and not to drive any more that night. Disregarding the officer's admonition, the man drove off after the officer left and, while doing so, hit a pedestrian, who, as a result of the collision, lost his leg. This Court held that a special relationship had not been established in that case. It reasoned that the victim had "alleged no facts which show that [the police officer] affirmatively acted specifically for [the victim's] benefit." 306 Md. at 631–32, 510 A.2d at 1085.

The Court applied the *Ashburn* standard in *Muthukumarana v. Montgomery County,* 370 Md. 447, 805 A.2d 372.[12] The

---

12. Two cases were decided and reported together in that case, *Fried v. Archer,* No. 84, September Term, 2001, and, *Muthukumarana v. Montgomery County* No. 83, September Term, 2001, 370 Md. 447, 805 A.2d 372.

issue in that case was: "whether local government emergency telephone system employees (specifically operators, dispatchers, and managers) owe an individual tort duty to persons in need of their services, and, if so, under what circumstances the employees may be held liable for the negligent performance of that duty." *Id.* at 456, 805 A.2d at 377. Stated differently, the question was whether a special relationship existed between 9-1-1 employees and victim callers. The Court concluded that "a 911 employee generally owes no duty in tort for the negligent performance of his or her duties to an individual in need of emergency telephone services." *Id.* at 492, 805 A.2d at 398-99. It reasoned, "absent a special relationship between a 911 employee and an individual in need of emergency services, an employee does not owe such an individual a private duty in tort." *Id.* at 486, 805 A.2d at 395.

After reviewing the "special relationship" jurisprudence of jurisdictions throughout the country, the Court reaffirmed its *Ashburn* holding:

> "Although we acknowledge that a more formulaic special relationship test may facilitate greater predictability, our review of the many different special relationship requirements adopted by other jurisdictions reinforces our choice not to incorporate a more regimented approach into Maryland's special relationship test. We continue to believe that 'the intent of the "special relationship" doctrine is better addressed by our general standard outlined in *Ashburn*' because it preserves our ability to determine 'whether a special relationship exists' on a 'case-by-case basis.' "

*Muthukumarana,* 370 Md. at 495, 805 A.2d at 401 (*citing Williams v. Mayor and City Council of Baltimore,* 359 Md. 101, 150, 753 A.2d 41, 67-68 (2000)). Applying *Ashburn* to 9-1-1 employees, the Court stated:

> "[I]n order for a special relationship between a 911 employee and a person in need of assistance to exist, it must be shown that the 911 employee *affirmatively acted* to protect or assist the specific individual, or a specific group of individuals like the individual, in need of assistance, thereby

often inducing the specific reliance of the individual on the employee[,]"

*Muthukumarana,* 370 Md. at 496, 805 A.2d at 401 (emphasis added), and that:

"In our view, acting to protect or assist a 'specific group of individuals,' sufficient to create a special relationship, involves more than general actions taken to serve members of the public at large in need of emergency telephone services. To find otherwise, by equating a duty to act with the provision of a general public service, might jeopardize the availability of those services in the first instance."

*Muthukumarana,* 370 Md. at 499–500, 805 A.2d at 403.

This reasoning is applicable to the case *sub judice.* As in *Muthukumarana,* in this case, an "affirmative act" sufficient to create a special relationship "involves more than general actions taken to serve members of the public at large." *Id.* at 499, 805 A.2d at 403.

Removing the appellant from the care of his mother and placing him in the foster care program was a statutorily mandated and required act of the State. It was affirmative in the respect that the State took action to place him in the custody of the child welfare program, but it was not an "affirmative act" sufficient to create a special relationship giving rise to a duty out of which a claim based on negligence can result. Without specifically applying the public duty doctrine to the State's actions in this instance, we hold that an affirmative act sufficient to create a special relationship must consist of something more (as in *Horridge,* albeit statutorily mandated) than simply placing a child in foster care. *See Williams,* 359 Md. at 140, 151, 753 A.2d at 62, 68 (Where a police officer told individuals to go into a house and that he would remain, the officer may have had a duty to tell them he was leaving. "[A]ffirmative actions and specific promises of protection ..., if in fact they occurred, are sufficient to have created a special relationship ....").

Child welfare services pursuant to statute are services to the general public. The State, by creating a program of such

services, available to the general public, does not create a special relationship to any particular individual. Generally, without factual allegations of some other affirmative act beyond that required under the general program, no common law special relationship to any specific individual normally will result. As we said in *Muthukumarana*, "[t]o find otherwise, by equating a duty to act with the provision of a general public service, might jeopardize the availability of those services in the first instance." 370 Md. at 499–500, 805 A.2d at 403. This decision "is consistent with our view of narrowly construing the 'special relationship' exception." *Patton*, 381 Md. at 642, 851 A.2d at 574.

The appellant did not allege in his amended complaint that the State took any action other than what was mandated statutorily. Therefore, we conclude that there was no affirmative act on the part of the State that created a common law special relationship. Furthermore, in the case *sub judice*, the appellant did not allege with sufficient specificity facts necessary to establish that the State had a duty to the appellant in this instance. The trial court correctly granted the State's motion to dismiss for failure to state a claim.

## IV.

The purpose of child welfare services is to place children in a protective setting. It is for this reason that there are significant statutory guidelines that dictate how the State is to operate and monitor group home care programs. The appellant did not allege that the State failed adequately to license or monitor Finding Direction, Inc., the group home in question, nor did he allege that the group home was, or was being, operated improperly. Moreover, the appellant did not allege knowledge by the State of the abuser's history of abuse or propensity for that kind of conduct. Absent a sufficient factual allegation that the State had knowledge, or reason to know, that Wratchford had some propensity for abuse as well as knowledge that he would be placed in close proximity to the appellant, a likely target of those propensities, there is no duty giving rise to a cause of action for negligence. The allegations

in the amended complaint were factually insufficient to plead a duty on the part of the State. The motion to dismiss was properly granted by the trial court.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.